IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,944

STATE OF KANSAS,
*Appellee*,

v.

ELI A. BETANCOURT,
*Appellant*.

SYLLABUS BY THE COURT

1.

The prosecution must prove by a preponderance of the evidence that an accused's inculpatory statements to a law enforcement officer were freely and voluntarily given.

2.

In determining whether an accused's inculpatory statements to a law enforcement officer were freely and voluntarily given, a trial court looks at the totality of the circumstances surrounding the statements and determines their voluntariness by considering the following nonexclusive factors: (a) the accused's mental condition; (b) the manner and duration of the interviews; (c) the accused's ability to communicate on request with the outside world; (d) the accused's age, intellect, and background; (e) the officer's fairness in conducting the interviews; and (f) the accused's fluency with the English language.

3.

On appeal of a trial court's determination regarding the voluntariness of an accused's inculpatory statements, an appellate court applies a dual standard when

reviewing the trial court's decision on a suppression question. First, the factual underpinnings of the decision are reviewed under a substantial competent evidence standard. Next, the appellate court reviews the trial court's legal conclusion drawn from those facts de novo. An appellate court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence.

4.

The right to counsel under the Fifth Amendment to the United States Constitution applies when the accused has expressed his or her wish for the particular sort of attorney assistance that is the subject of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with a custodial interrogation by law enforcement. Likewise, after an accused has invoked his or her statutory right to counsel under K.S.A. 22-4503, a police-initiated interrogation of the accused is a stage of the criminal proceedings at which the accused is entitled to the assistance of his or her counsel.

5.

Generally, this court reviews a trial court's determination that hearsay is admissible under a statutory exception, such as K.S.A. 60-460(i)(2), for an abuse of discretion. There are three ways in which a trial court can abuse its discretion:  (1) when no reasonable person would take the view adopted by the trial court; (2) when a ruling is based on an error of law; or (3) when substantial competent evidence does not support a trial court's findings of fact on which the exercise of discretion is based.

6.

K.S.A. 60-460(i)(2) provides that hearsay evidence is inadmissible unless the party and the declarant were participating in a plan to commit a crime or a civil wrong

2

and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination. K.S.A. 60-460(i)(2) does not require the statement to have been made outside the party's presence.

7.

K.S.A. 60-460(i)(2) explicitly limits the admissibility of hearsay to a statement made while a plan is in existence and before its complete execution or other termination. This requirement pertains to the furtherance of the plan's common design, to its consummation, to the disposition of its fruits, and to acts done to preserve its concealment.

8.

*Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), applies only when a confession of a codefendant implicating the accused is received in evidence in a joint trial.

9.

Statements in furtherance of a conspiracy are not testimonial.

10.

An eyewitness identification instruction need only be given where eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification.

11.

An appellate court considering a criminal defendant's challenge to the sufficiency of the evidence must consider all the evidence in a light most favorable to the prosecution. After doing so, the appellate court can uphold the conviction only if it is

convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In assessing the sufficiency of the evidence, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

12.

Premeditation may be inferred from factors that include: (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. The reasonableness of an inference is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. Use of a deadly weapon by itself, however, is insufficient to establish premeditation.

13.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. In testing if this right has been violated, courts use the two-prong test stated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984).

14.

An appellate court reviewing a trial court's ruling on a claim of ineffective assistance of counsel reviews any factual findings for substantial competent evidence and evaluates whether those findings support the trial court's conclusions of law.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed February 13, 2015. Affirmed.

4

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Thirteen-year-old Miguel Andrade died from gunshot wounds suffered as he opened the door of his family's home. The State charged four men with crimes related to Miguel's death. One of those men, Eli A. Betancourt, brings this appeal after a jury convicted him of premeditated first-degree murder and criminal discharge of a firearm at an occupied building. He raises five issues related to (1) the admission of his statements to law enforcement officers, (2) the admission of certain hearsay statements, (3) the trial court's failure to give an instruction on eyewitness testimony, (4) sufficiency of the evidence, and (5) allegations of ineffective assistance of trial counsel. In response, the State initially raised a jurisdictional question regarding the timing of Betancourt's notice of appeal but subsequently withdrew its argument; in addition, the State argued and maintains that the trial court committed no errors. For the reasons stated in this opinion, we conclude Betancourt's arguments lack merit, and, therefore, we affirm his convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

Besides Betancourt, the State charged Betancourt's half brother, Alejandro Betancourt, Jr.; Edward Laurel; and Gregory Patton with crimes related to Miguel's death. Patton entered into a plea agreement with the State under which Patton agreed to testify in the prosecution of the other men in exchange for reduced charges. Alejandro's

5

and Laurel's cases went to trial, and jurors convicted them as charged. Both men appealed, and their convictions were affirmed. See *State v. Laurel*, 299 Kan. 668, 325 P.3d 1154 (2014); *State v. Betancourt*, 299 Kan. 131, 322 P.3d 353 (2014). Although the general facts of the crimes are discussed in those opinions, we will discuss the evidence at Betancourt's trial because he raises a sufficiency and other fact-based arguments. Betancourt's jury learned the details of the crimes through the testimony of a detective who interrogated Betancourt shortly after the shooting, several eyewitnesses, forensic experts, Patton, and Betancourt himself.

*Betancourt's Statements to Detectives*

According to Betancourt's statements to law enforcement officers, the night before the shooting he, Alejandro, Laurel, Patton and many other individuals attended a birthday party. During the party, several individuals challenged Betancourt to avenge a previous "attack" on Daniel Betancourt, Eli's half brother and Alejandro's brother. As these discussions progressed, Laurel indicated he knew where one of the individuals associated with the attack had been staying. In the early morning hours, Betancourt left the party with Alejandro and Patton. Betancourt drove the other two men to another location where they picked up Laurel, who directed Betancourt to a house occupied by Miguel's family. The group merely drove by Miguel's house and then went to another location where Laurel retrieved two guns. The group returned to Miguel's house, this time with Alejandro in the driver's seat.

En route to Miguel's house, Laurel gave Betancourt one of the guns, which Betancourt described as a "Beretta." Betancourt told detectives that Laurel kept a "real small" gun with a "long" barrel. While they drove, Betancourt texted a female friend, saying, "I'm gonna go do something," and "If I don't see you for a while . . . I don't want you to think that I'm just gonna disappear."

6

When the men got to Miguel's house, Betancourt and Laurel got out of the car and approached the front door. Betancourt held open the screen door with his leg, and Laurel banged on the main door with his gun. When the knob began to turn and the door began to open, Laurel said, "[G]et him." Laurel started shooting, and Betancourt followed suit. According to Betancourt, he aimed his shots for the middle of the door. After the shooting, they ran up the street, and the others picked them up. Betancourt gave his gun back to Laurel.

Alejandro drove until they dropped off Laurel, who took both guns with him. Betancourt took over the driving and within minutes noticed a police car following him. He pulled over, and the three friends were taken into custody. Later that day, Laurel was located and taken into custody as well. The guns were never recovered.

*Betancourt's Testimony*

At trial, Betancourt relayed a somewhat different version. He told the jury he went to Miguel's house with Laurel and the others only because he wanted to get an address to give to his father, who had been conducting his own investigation of the assault on Daniel. When the men drove by the house the first time, it was too dark to see the house numbers, so they left. After drinking until it got brighter outside, they returned to "look in the window for some bald-headed guy that was in the fight." Betancourt testified that, as far as he knew, they did not have guns on this second driveby. They still could not see the address, so they kept going "and started drinking some more." Betancourt told the jury that after a night of partying and drinking he was intoxicated to a level of 8 on a scale of 10.

As the sun began to rise, the group made a third trip to Miguel's house. This time, Laurel brought guns. Betancourt testified that he agreed to "just get it"—the address—"and go." Someone handed him a gun—he thought it was a Beretta—"just in case." He denied that there was a plan to kill anyone, asserting that he only took a gun for "precaution reasons."

Betancourt put the gun under his shirt and walked up to the house with Laurel, while Alejandro drove a short distance away. Laurel told Betancourt, "[L]et's just walk up there, . . . see if we can find some numbers somewhere and that was it." When he and Laurel stepped up to the front door, Betancourt pulled on the screen door as he tried to balance himself while looking into the front window located to the left of the door. He could not see anything because of the window coverings. Laurel then suggested that they knock on the door, and Betancourt said "no," "I'm done," and "I'm not stickin' around." Betancourt started walking away as Laurel knocked on the door. Halfway back to the driveway, Betancourt "heard a gunshot" and "froze." At first Betancourt thought Laurel was shooting at him because Laurel was angry that he had walked away. Then, he heard more shots, so "I just put my arm back and was just . . . shooting the gun." He told the jury he did not know what direction he was shooting, but he denied shooting at the center of the front door. He testified, "I just panicked, I got scared, freaked out."

*Other Evidence*

The State presented evidence from other witnesses who incriminated Betancourt. Patton testified that Laurel told the others that he "wanted to get back at these guys" by shooting somebody. When they got to the house, Patton knew a shooting was about to take place and told Betancourt three times that "we shouldn't do this." But Betancourt insisted on going forward. After the shooting, Laurel told them, "I got him." Patton noticed that both Betancourt and Laurel had a gun.

8

Neighbors who observed the scene were able to describe what happened and to give descriptions of the two gunmen who resembled Betancourt and Laurel. They saw two Hispanic men walk up to the house; one was wearing a white shirt—like the one Betancourt was wearing when arrested—and the other a red shirt. One of the men either knocked on the door or rang the doorbell while the other looked into a window. The two men started shooting at the door when it appeared that someone inside the house was approaching the door. One neighbor saw a man near the driveway, and it looked like he was firing a weapon. Another neighbor reported seeing one gunman in a red shirt fire first, followed by the other gunman in the white shirt; the one in the white shirt was "running backwards, firing," and moving towards the driveway. Some neighbors identified Betancourt as one of the shooters.

A crime scene investigator testified that at least 10 shots from a .22 caliber gun and a .9 mm gun were fired into the main door. Other shots flanked the door. Eyewitness testimony and other corroborating evidence suggested that Betancourt fired the .22 caliber bullets and Laurel fired the .9 mm bullets. The location of casings suggested the .9 mm gun was fired closer to the house than the .22 caliber casings (linked to Betancourt). Upon examination of the body, the coroner was able to recover a .9 mm bullet, but the coroner could not attribute the death to any particular bullet. Miguel suffered injuries to his abdomen, legs, and hand.

The State filed an information charging Betancourt with one count of premeditated first-degree murder, or, in the alternative, one count of felony first-degree murder, and one count of criminal discharge of a firearm at an occupied building. A jury found him guilty of premeditated first-degree murder and criminal discharge of a firearm. The court sentenced him to a hard 25 life sentence for murder and a consecutive 13-month sentence for criminal discharge of a firearm.

Betancourt argues the trial court erred in admitting into evidence his statements to the detectives. He suggests that his age, his intellect, the influence of alcohol, sleep deprivation, and the "long isolation and detention" in the interview room rendered his confession involuntary.

*Additional Facts*

Betancourt first raised this issue before trial by filing a motion to suppress, and the State filed a motion requesting admission of the statements and an evidentiary hearing on the matter. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); see also *State v. Bogguess*, 293 Kan. 743, 751, 268 P.3d 481 (2012) (at a *Jackson v. Denno* hearing, the issue before the court is whether defendant's statement or confession was voluntary; truthfulness of a statement is not at issue). The trial court held a hearing at which a detective testified about what happened before and during the interrogation.

The detective testified that Betancourt was taken to an interrogation room and held there for 7 to 8 hours while detectives investigated the crime. During this time, the detectives handcuffed one of Betancourt's arms to the table. Officers repeatedly checked on him and offered water, food, and a restroom. Meanwhile, law enforcement officers visited the scene of the crime and interviewed other witnesses. Two detectives then conducted a recorded interview of Betancourt. The interrogation lasted just over 3 1/2 hours. During that time, the detectives often left the room, leaving Betancourt alone. Actual questioning lasted approximately 2 1/2 hours. The detective calculated that a total of 14 or 15 hours passed between Betancourt's arrival at the police station and his transport to the jail.

The testifying detective told the trial court that when he asked Betancourt for personal information, "all of his answers [were] appropriate," and Betancourt "sat upright, we made eye contact, he spoke immediately in response" to questions, and "his dialogue appeared to be very much . . . normal for any other person." After obtaining Betancourt's personal history, the detective read an advice of rights form while Betancourt read along. After reading each of the *Miranda* rights, the detective asked Betancourt if he understood; Betancourt acknowledged that he did and initialed each line. Betancourt then signed the form and indicated that he wanted to speak with detectives.

*General Principles/Standards of Review*

When Betancourt challenged his inculpatory statements as involuntarily given, the State was required to prove voluntariness by a preponderance of the evidence. See *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013). The trial court was then obligated to assess voluntariness under the totality of the circumstances, considering several nonexclusive factors:  (1) Betancourt's mental condition; (2) the manner and duration of the interrogation; (3) Betancourt's ability to communicate on request with the outside world; (4) Betancourt's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) Betancourt's fluency with the English language. See *State v. Gibson*, 299 Kan. 207, 214, 322 P.3d 389 (2014). Any one factor or a combination of factors "may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citations omitted.]" *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009).

In this case, the trial court explicitly considered these factors, made findings on the record, and concluded that Betancourt's statement was voluntary.

11

As we consider Betancourt's challenge to these findings, we apply a bifurcated standard of review. First, without reweighing the evidence, we examine the trial court's findings of fact to determine whether they are supported by substantial competent evidence. Next, we apply a de novo standard of review to the ultimate legal conclusion regarding the suppression of evidence. We cannot reweigh evidence, assess witness credibility, or resolve conflicting evidence. *Gibson*, 299 Kan. at 215-16.

*Betancourt's Arguments*

In asking this court to consider the totality of the circumstances, Betancourt focuses on three factors: his mental condition; his age and intellect; and the duration and manner of the detention and interrogation. He does not cite any caselaw to support his arguments.

*Mental Condition*

First, Betancourt claims that his statements were rendered involuntary because he was sleep deprived and had "cocaine and alcohol [running] through his veins[,] dulling his brain and impairing his judgment." Several points weaken Betancourt's argument. First, no evidence supports Betancourt's assertion that there was cocaine in his system. The record citation he provides is to a posttrial hearing, and that evidence only establishes that others were using cocaine at the birthday party. Second, although Betancourt points to evidence of excessive drinking, the evidence is conflicting. While Betancourt told the jury he drank heavily throughout the evening and was very intoxicated, he had told interrogating officers he had only 2 or 3 beers approximately 12 hours before the interview. Third, merely having alcohol or drugs running through his veins did not make his statement involuntary; rather, there must be evidence the alcohol

12

and drug use impaired Betancourt's ability to give a knowing and voluntary confession. See *State v. Gilliland*, 294 Kan. 519, 529, 276 P.3d 165 (2012), *cert. denied* 133 S. Ct. 1274 (2013); *State v. Norris*, 244 Kan. 326, 334-35, 768 P.2d 296 (1989). Similarly, lack of sleep does not per se render the statements involuntary. See *State v. Gonzalez*, 282 Kan. 73, 104, 145 P.3d 18 (2006). Finally, Betancourt does not identify any point in the interrogation where the effects of alcohol and drug use or sleep deprivation were manifested. For example, he does not cite to a point where he seemed confused, unable to understand, or unable to remember what had occurred. This court has repeatedly rejected appellate arguments suffering from similar weaknesses. One such case is *State v. Holmes*, 278 Kan. 603, 613, 102 P.3d 406 (2004).

In *Holmes*, the defendant argued that drug use and sleep deprivation, among other factors, impaired his ability to give a knowing and voluntary confession. The *Holmes* court noted that "the detectives testified that Holmes appeared coherent, answered questions rationally, and recalled events leading up to the shooting. In addition, he was cooperative with the detectives and showed no signs of being under the influence of drugs except for appearing tired." 278 Kan. at 614. Thus, substantial evidence supported the trial court's finding that Holmes' confession was not involuntary based on drug use. 278 Kan. at 614. With regard to alleged lack of sleep, this court noted: "Without evidence that Holmes asked to sleep or that he was not allowed to sleep, we cannot conclude that sleep deprivation rendered his statement involuntary." 278 Kan. at 615.

Likewise, in this case, substantial competent evidence supports the trial court's findings. Betancourt's behavior and responses during the interview do not suggest that he had a difficult time staying awake during the interrogation or was affected by drugs or alcohol. The recording of the interview reveals Betancourt sleeping during portions of the 7- or 8-hour period that he was held in the interview room before the detectives arrived for questioning. When questioning began, Betancourt appeared tired, but he listened

13

carefully, spoke clearly, and answered questions without hesitation. He did not request sleep, and he remained responsive and articulate.

*Age and Intellect*

As for Betancourt's age and intellect, the trial court found that Betancourt "was given a *Miranda* warning, he went through the form with the officer, he understood what his rights were. Throughout the course of the interview [Betancourt] was responsive and the answers were within the context of the questions that were asked." In arguing to reverse the trial court, Betancourt labels himself as a 20-year-old "high school drop out." He offers no other evidence to suggest his age or intellect weighs toward a conclusion that his statements were involuntary.

The record shows that Betancourt was 19 years old at the time of the interview, approximately 1 month before his 20th birthday. Thus, Betancourt had achieved adult status. Further, he had one previous arrest, so he was not completely unfamiliar with the process. Also, although the record establishes that Betancourt had been "kicked out" of high school during the second semester of his senior year, it also establishes that he ultimately obtained his GED. There is nothing in the record to indicate low intelligence.

In sum, there is no evidence that Betancourt's general mental condition, his age, or his intelligence interfered with his ability to understand his rights or to voluntarily and knowingly waive those rights, to understand the detectives' questions, or to "understand the incriminating nature of his own statements," which are the essential considerations. See *Randolph*, 297 Kan. at 331; *State v. Ackward*, 281 Kan. 2, 9, 12, 128 P.3d 382 (2006) (where defendant was 20 years old and failed to graduate from high school, finding "he was not of an especially tender age and the trial judge, who had the opportunity to observe defendant in person, perceived him as being mature").

14

*Duration and Manner*

Betancourt's strongest argument—one that raises considerable concern—arises from the detectives' holding him for 14 or 15 hours, much of it handcuffed to a table. The case of *State v. Brown*, 285 Kan. 261, 173 P.3d 612 (2007), is instructive.

Brown was 21 years old at the time of his police interrogation, appeared to be a person of reasonable intelligence, and had previous exposure to the justice system. He attacked the voluntariness of his statements made during a custodial interrogation, in part, because he was held in the interview room, handcuffed to a table, for nearly 12 hours and because the interview itself lasted just under 5 hours. The *Brown* court noted that in periods between questioning, when officers stopped to investigate various aspects of the case, Brown appeared to be napping. He was also given breaks to eat a meal and to use the restroom. 285 Kan. at 271.

The *Brown* court stated that the "length of Brown's confinement to the interrogation room, while handcuffed to a table for long periods of time, causes the issue of voluntariness to be close." 285 Kan. at 272. Although there were legitimate reasons for the delays, the *Brown* court emphasized that "the legitimacy of or justification for the delays does not erase the concern over whether the length of time of confinement in the interview room while handcuffed to a table was so excessive as to be coercive." 285 Kan. at 272-73. And officers' legitimate reasons for detaining a suspect cannot be "a license for law enforcement to extend interviews to such an excessive length that a suspect's will is overborne." 285 Kan. at 273. Nevertheless, the *Brown* court refused to draw a bright line regarding a specific time period where an interrogation becomes inherently coercive. 285 Kan. at 273; but see *Ashcraft v. Tennessee*, 322 U.S. 143, 153-54, 64 S. Ct. 921, 88 L. Ed. 1192 (1944) (36-hour interrogation inherently coercive). The *Brown* court found that a

15

differentiation between the detention time and the interrogation time is a factor to consider in reviewing the totality of the circumstances. *Brown*, 285 Kan. at 273 (citing *State v. Agnello*, 269 Wis. 2d 260, 273-74, 674 N.W.2d 594 [2003] [discussing issue of duration and collecting cases where time of detention ranged from 8 hours to 7 days]).

Ultimately, the *Brown* court stated that the 12 hours "stretch[ed] to the temporal boundaries of an uncoercive interrogation," but the duration and manner of the interview were not coercive under the circumstances of the case, where breaks were taken, the defendant napped, and the defendant was permitted to leave the room for short periods. 285 Kan. at 274.

The duration of the detention in this case—14 to 15 hours—exceeds *Brown*'s 12 hours; clearly, if *Brown* stretched the temporal limits, so does this case. But this court has held other interrogations were voluntary even though they lasted similar or longer periods of time. See *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007) (statements voluntary where defendant was held for almost 13 hours and confessed to committing crime after about 8 hours); *State v. William*, 248 Kan. 389, 409-10, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (statements voluntary where defendant was interrogated for approximately 6 hours over a 19-hour period). In addition, similar to the situation in *Brown*, there were breaks taken, Betancourt slept, he was allowed to go to the restroom, and he was offered and given food and water. Betancourt does not claim that detectives threatened him or promised him anything. He cites nothing in the record to suggest the length of detention motivated him to unwillingly give inculpatory statements.

Under the circumstances, there is substantial competent evidence to support the trial court's conclusion that the duration and manner of the interview did not render Betancourt's statements involuntary.

*Outside Contact*

In Betancourt's appellate brief, he complains he was in "isolation" and was kept "away from the comfort of friends[,] families[,] counselors or advisors" while he waited in the interview room for 8 hours. But past cases have examined "the accused's ability to communicate *on request* with the outside world." (Emphasis added.) *Gibson*, 299 Kan. at 214. Here, Betancourt fails to cite any support in the record for such a request. See *State v. Stone*, 291 Kan. 13, 22, 237 P.3d 1229 (2010) (defendant did not ask to communicate with anyone outside of the interrogation; thus, that factor "simply did not apply").

*Totality of the Circumstances*

As discussed above, while the duration and manner of the interview are troubling, that circumstance alone does not compel us to conclude as a matter of law that Betancourt's statements were involuntary. And no other factor weighs in his favor. Therefore, the totality of the factors and circumstances of the interrogation lead to the conclusion that Betancourt's statements were the product of his free and independent will.

*Right to Counsel*

Primarily relying on *State v. Lawson*, 296 Kan. 1084, 1094, 297 P.3d 1164 (2013), Betancourt also argues his statements should have been suppressed because he was denied his right to counsel under the Fifth Amendment to the United States Constitution and K.S.A. 22-4503. But Betancourt does not cite to any point during the interrogation where he invoked his right to counsel, and he must have done so to be entitled to relief under this argument. Simply put, the right to counsel under the Fifth Amendment applies *when the accused has expressed his or her wish* for the particular sort of attorney assistance that is the subject of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.

Ed. 2d 694, *reh. denied* 385 U.S. 890 (1966). *State v. Appleby*, 289 Kan. 1017, 1045-46, 221 P.3d 525 (2009). "'It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*.'" 289 Kan. at 1046 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 [1991]). Likewise, "[a]fter [an accused] has invoked his or her statutory right to counsel [under K.S.A. 22-4503], a police-initiated interrogation of the [accused] is a stage of the criminal proceedings at which the [accused] is entitled to the assistance of his or her counsel." *Lawson*, 296 Kan. 1084, Syl. ¶ 6.

Because Betancourt fails to establish that he requested the assistance of counsel during his interrogation, he fails to establish that he was denied his statutory or constitutional right to counsel during the interview.

## NO ERROR IN ADMISSION OF HEARSAY STATEMENTS

Next, Betancourt argues the trial court erred by admitting into evidence hearsay statements made by Laurel and Alejandro under the coconspirator's statement exception found in K.S.A. 60-460(i)(2). Betancourt also argues that the admission of these statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Although Betancourt attempts to sweep many statements into his argument, he cites to only two places in the record where he preserved appellate review of this issue by making an objection when the statements were admitted at trial. See K.S.A. 60-404 (providing that no verdict shall be set aside based upon the erroneous admission of evidence unless an objection was "timely interposed and so stated as to make clear the specific ground of objection"); *State v. McCullough*, 293 Kan. 970, 999, 270 P.3d 1142

18

(2012) (appellant's burden to designate a record affirmatively showing error); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (evidentiary claims "must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal"). The first preserved statement consists of Patton's testimony about a statement Laurel made before the shooting when Laurel said "he knows where these guys live." The second preserved statement consists of Patton's testimony about a statement Laurel made after the shooting when Laurel said, "I got him, I got him."

*Standard of Review*

Generally, this court reviews a trial court's determination regarding whether hearsay is admissible under a statutory exception, such as K.S.A. 60-460(i)(2), for an abuse of discretion. *State v. Davis*, 283 Kan. 569, 573, 158 P.3d 317 (2006); see *State v. Summers*, 293 Kan. 819, 827, 272 P.3d 1 (2012); *Brown*, 285 Kan. at 294. There are three ways in which a trial court can abuse its discretion: (1) when no reasonable person would take the view adopted by the trial court; (2) when a ruling is based on an error of law; or (3) when substantial competent evidence does not support a trial court's findings of fact on which the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Betancourt focuses on the second and third grounds.

In addition to determining if the trial court abused its discretion in applying K.S.A. 60-460(i)(2), we must consider Betancourt's argument that the ruling violated his rights under the Confrontation Clause. This attack on the trial proceedings raises a question of law over which this court employs an unlimited standard of review. *State v. Johnson*, 297 Kan. 210, 224, 301 P.3d 287 (2013); *State v. Breedlove*, 295 Kan. 481, 489, 286 P.3d 1123 (2012).

*Coconspirator Exception*

The exception on which the trial court based the admission of the evidence, K.S.A. 60-460(i)(2), provides that hearsay evidence is inadmissible unless "the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

Betancourt does not dispute that there was evidence establishing a substantial factual basis for a conspiracy between him, Patton, and Laurel. Instead, he asserts K.S.A. 60-460(i)(2) does not apply because the statements were not made outside his presence and were not made while the conspiracy was ongoing.

To support his argument that the statements must have been made outside his presence, Betancourt cites *State v. Bird*, 238 Kan. 160, 176, 708 P.2d 946 (1985). This court in *Bird* approved a five-part test that must be met for statements to be admissible under K.S.A. 60-460(i)(2). One prong of the test required the statements to be made outside the party's presence. But Betancourt fails to acknowledge that this court in *State v. Sharp*, 289 Kan. 72, 102, 210 P.3d 590 (2009), disapproved the outside-the presence-of-the-party requirement after noting it was not included in the clear statutory language of K.S.A. 60-460(i)(2). After *Sharp*, a four-part—rather than the previous five-part—test for admission of evidence under K.S.A. 60-460(i)(2) applies, requiring: (1) the person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been made while the conspiracy was in progress; and (4) the statement must be relevant to the plan or its subject matter. 289 Kan. at 102 (also disapproving *State v. Roberts*, 223 Kan. 49, 574 P.2d 164 [1977]). Betancourt's argument relying on a disapproved test fails.

20

Betancourt focuses on the third requirement in his next argument, asserting that the two statements made by Laurel were not made while the conspiracy was in progress. This requirement is explicitly stated in K.S.A. 60-460(i)(2), which requires that the statement be made "while the plan was in existence and before its complete execution or other termination." The State presents a two-fold argument in response to Betancourt's assertion that the conspiracy was not in progress when the statements were made.

First, the State argues that Betancourt did not make this argument before the trial court. While Betancourt's arguments to the trial court are at best ambiguous as to this prong, the trial court did address and reject the possibility that the statements occurred outside the temporal framework of the conspiracy. In doing so, the trial court concluded that "the conspiracy continued for a period of time after [the shooting], until Mr. Laurel was dropped off." Given that the trial court apparently understood Betancourt's objection to include a failure by the State to meet the requirement of an ongoing conspiracy, we will address the argument's merits.

The State's second argument addresses the merits. The State contends the trial court did not err in concluding the statements were made while the conspiracy was in progress. We agree. There is substantial competent evidence supporting the trial court's ruling.

The first of Laurel's statements introduced through Patton's testimony—that is, of Laurel "saying he knows where these guys live"—occurred, among other times, while the men were driving to Miguel's house. Betancourt's own statements establish that there had already been discussions about seeking revenge against those involved in the fight with Daniel and that Betancourt had agreed to participate. Thus, admitted evidence established

21

an agreement had been reached, and the men's actions of driving to the house were in furtherance of that agreement.

The second statement—that is, of Laurel saying, "I got him, I got him"—was made just after the shooting, during the getaway phase when Betancourt, Alejandro, Patton, and Laurel were fleeing the crime scene with the guns that Laurel later disposed of in such a way they were never found. The trial court found that the conspiracy "continued . . . until Mr. Laurel was dropped off." This finding follows the rationale that in Kansas, the K.S.A. 60-460(i)(2) exception "pertains to the furtherance of the common criminal design, to its consummation, to the disposition of its fruits, and to acts done to preserve its concealment." *State v. Borserine*, 184 Kan. 405, 411, 337 P.2d 697 (1959); see *State v. Sharp*, 289 Kan. 72, 105, 210 P.3d 590 (2009) (exception applied to conspirator's statements made before victim's shoes, socks, and glasses were burned to conceal the crime). Laurel's statement that "I got him, I got him," pertains to the furtherance of the common criminal design and its consummation. And the statement was made before Laurel's attempt to conceal the conspiracy.

Thus, substantial competent evidence supported the trial court's ruling that the factual requirements for the application of K.S.A. 60-460(i)(2) were satisfied. The trial court did not abuse its discretion in admitting Laurel's statements under this exception. Because we reach this holding, we need not discuss the State's other arguments regarding alternative grounds for the admission of the evidence.

*Confrontation Clause*

Betancourt also argues the admission of these statements violated his right to confrontation under (1) the rule established in *Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), where an accused's right to confrontation is

violated when the confession of a codefendant implicating the accused is received in evidence in a joint trial; and (2) *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), because the statements were testimonial hearsay. Neither argument is supported by caselaw.

As to Betancourt's first argument, caselaw clearly establishes that *Bruton* only applies to statements that are admitted in a *joint* trial. See *Bruton*, 391 U.S. at 135-36 (expressing concern "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial"); *United States v. Volpendesto*, 746 F.3d 273, 290 (7th Cir. 2004) (citing *Bruton* for the rule that "[i]f a co-defendant makes an out-of-court confession that inculpates the defendant, and the co-defendant does not testify at their joint trial, the out-of-court statement cannot be introduced as evidence at all; the risk of prejudice to the non-confessing defendant is simply too great"). There was no joint trial in this case, and *Bruton* does not apply.

Betancourt's second argument—that is, that Laurel's statements are testimonial and therefore inadmissible under the holding in *Crawford* unless Betancourt could confront Laurel—ignores the United States Supreme Court's categorical and unqualified declaration in *Crawford* that "statements in furtherance of a conspiracy" are not testimonial. *Crawford*, 541 U.S. at 56; *Sharp*, 289 Kan. at 101 (recognizing *Crawford* 's statement that coconspirators' statements are not testimonial); *State v. Jackson*, 280 Kan. 16, 35, 118 P.3d 1238 (2005), *cert. denied* 546 U.S. 1184 (2006) (same).

Thus, Laurel's statements were admissible under K.S.A. 60-460(i)(2) and the admission of those statements did not violate Betancourt's constitutional right to confront witnesses. Betancourt's claim of error fails.

23

Next, Betancourt argues the trial court committed clear error when it failed to *sua sponte* give PIK Crim. 3d 52.20, the pattern eyewitness identification instruction that lists various factors jurors should consider in weighing eyewitness reliability and accuracy. Betancourt's argument fails because he does not establish that the instruction was legally and factually warranted. *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 3, 4, 5, 286 P.3d 195 (2012) (discussing K.S.A. 22-3414[3] and setting out progression of analysis and the corresponding standards of review for deciding a jury instruction issue when party did not request instruction at trial).

More specifically, Betancourt fails to acknowledge or discuss this court's explicit statements indicating that an eyewitness identification instruction need only be given where "eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification." *State v. Warren*, 230 Kan. 385, 397, 635 P.2d 1236 (1981); see *State v. Gaines*, 260 Kan. 752, 758, 926 P.2d 641 (1996) (same), *overruled on other grounds by State v. Carr*, 300 Kan. 1, 331 P.3d 544 (2014); *State v. Willis*, 240 Kan. 580, 585, 731 P.2d 287 (1987) (same). In this case, the neighbors' identification of Betancourt was not crucial to the State's case because Betancourt admitted—to interrogating officers and the jury—that he was present at the scene and was one of the shooters. The issue in dispute at trial involved Betancourt's intent or mental state, not his identity. Hence, the trial court committed no error by not providing a cautionary eyewitness identification instruction.

Betancourt next contends that there was insufficient evidence to support his conviction for premeditated first-degree murder. He argues that the State failed to prove the elements of premeditation and intent to kill.

*Standard of Review/Legal Considerations*

An appellate court considering a criminal defendant's challenge to the sufficiency of the evidence must consider all the evidence in a light most favorable to the prosecution. After doing so, the appellate court can uphold the conviction only if it is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. "Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014) (citing *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 [2013]).

When applying this standard to the sufficiency of evidence regarding premeditation and intent, it is not necessary that there be direct evidence of these elements. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008). In considering circumstantial evidence, Kansas caselaw identifies factors to be considered in determining whether the circumstantial evidence in a case gives rise to an inference of premeditation. These factors include: "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]" *Scaife*, 286 Kan. at 617-

25

18; see *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013). While each of these factors should be considered, the reasonableness of an inference of premeditation is not driven by the number of factors present in a particular case. Indeed, in some cases one factor alone may be compelling evidence of premeditation. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008); *State v. Morton*, 277 Kan. 575, 582-83, 86 P.3d 535 (2004) (evidence to support second and third factors sufficient in finding premeditation). Use of a deadly weapon by itself, however, is insufficient to establish premeditation. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011).

*Evidence Was Sufficient*

A review of the record shows both direct and circumstantial evidence of premeditation and intent to kill. In his appellate brief, Betancourt ignores the five factors and the circumstantial and direct evidence against him. Instead, he relies heavily on his trial testimony, which supported his defense theory that there was no plan or intent to kill; rather, he took a gun for "precaution reasons" but panicked and fired his weapon recklessly. Betancourt argues the evidence showed that "[a]t most, [he] considered that there may be a shooting toward the house, but not with the intent to hit anyone other than the building itself."

Although the jury heard this evidence supporting Betancourt's defense theory, the jury also heard evidence incriminating Betancourt—evidence from which a rational factfinder could conclude that the killing was intentional and premeditated. Specifically, Patton testified to statements made in the car that evidenced a clear intent to shoot someone. Additionally, strong evidence of guilt came from Betancourt's own statements to detectives.

As to the nature of the weapon, Betancourt admitted to firing a gun. Regarding provocation, he indicated the motive for doing so was to avenge a fight in which his half brother Daniel was seriously injured; he cited no provocation on the day of the murder (or even the night before at the party). Rather, Betancourt and the other men actively sought out Miguel's residence; they were the aggressors. In fact, the jury learned that Daniel's alleged attacker, who was the boyfriend of Miguel's sister, had not stayed with Miguel's family for several weeks before Miguel's death because Miguel's mother disapproved of her daughter's relationship.

As for the third and fourth factors—Betancourt's conduct before and after the killing, and threats and declarations made before and/or during the occurrence—Betancourt admitted that he switched places with Alejandro, leaving Alejandro as the driver despite Alejandro's lack of a valid driver's license, so Betancourt could approach Miguel's house with Laurel. On the drive to Miguel's house, Betancourt texted a female friend that he was "gonna go do something" and "I don't want you to think I'm shady" if she did not see him "for a while." Then, according to Betancourt, at Miguel's house when the door knob started turning and Laurel said, "[G]et him," Betancourt began shooting, firing approximately six times. An examination of the front door showed six bullet strikes above the door handle in the "middle" of the door, with another four either lower or higher on the door. The higher shots came from a .22 caliber weapon, as did two holes on either side of the door. The evidence pointed to Betancourt as the shooter of the .22 caliber gun. Patton testified that when Betancourt and Laurel got back in the getaway car, Laurel said, "I got him, I got him." Betancourt said nothing in response.

Finally, the fifth factor—dealing lethal blows after the deceased was felled and rendered helpless—also weighs toward a finding of premeditation. Certainly, there is no evidence that Betancourt knew Miguel had been injured. But expert testimony at trial

27

showed that the victim was shot 10 times, which yielded 15 gunshot wounds. Some of the wounds were "graze wounds," which showed the victim "was trying to avoid or run."

Betancourt argues that the bullet strike pattern shows that he was firing "wildly and at random" and contends that his shots did not strike the fatal blow. But the evidence viewed in the light most favorable to the State provides evidence Betancourt shot in a pattern designed to hit someone standing on the other side of the door. And he did not just fire once, he fired multiple times. Furthermore, Betancourt fails to cite evidence that eliminates the possibility injuries resulting from the .22 caliber bullets caused or contributed to Miguel's death. The coroner left open the possibility, opining that he could not attribute the death to any particular bullet because of the devastating injuries to Miguel's abdomen, legs, and hand.

Even if Betancourt's bullets were not fatal strikes, the jury was instructed on aiding and abetting and, therefore, was told that a person who "either before or during its commission, intentionally aids another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime." See PIK Crim. 3d 54.05 (responsibility for crimes of another). Any lack of firing one fatal shot does not negate Betancourt's premeditation, his intent to commit murder, or his participation "'in a way that demonstrates willful furtherance'" of the crime. *State v. Betancourt*, 299 Kan. 131, 134, 322 P.3d 353 (2014) (quoting *State v. Herron*, 286 Kan. 959, 968, 189 P.3d 1173 [2008]). A rational factfinder could easily have concluded that Betancourt was a willing participant in a planned, retaliatory shooting in which he had the premeditated intent to kill whoever stood behind the door of a house where one of Daniel's attackers had been staying. See *Herron*, 286 Kan. at 968 (sufficient evidence of aiding and abetting first-degree felony murder; defendant participated in the planning, the mobilization, and the actual shooting attack).

28

Betancourt essentially asks this court to reweigh the evidence in light of his own trial testimony. The jury and not this court had the duty to weigh the evidence and determine the credibility of the witnesses. The evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational factfinder to find Betancourt guilty of premeditated first-degree murder.

## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL NOT ESTABLISHED

In Betancourt's final appellate issue, he contends that he is entitled to a new trial because he received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution. After the trial but before sentencing, Betancourt wrote a letter to the trial court complaining about his trial attorney. The court appointed new counsel and conducted a hearing. In the proceedings before the trial court, Betancourt identified two grounds for his ineffective assistance claim:  (1) lack of communication and (2) failure to consult an expert or present expert testimony regarding the effects of cocaine and alcohol.

*General Principles/ Standards of Review*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985); see *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012) (noting right is made applicable to the states through the Fourteenth Amendment to the United States Constitution). *Strickland* established a two-prong test for determining if a criminal defendant's Sixth Amendment right to effective assistance of counsel has been violated by an attorney's performance.

466 U.S. at 687-96. Kansas courts adopted this test in *Chamberlain*, 236 Kan. at 656-57. Under the first prong, a defendant must demonstrate that counsel's performance was deficient. 236 Kan. at 656. If so, the court moves to the second prong and determines whether there is a reasonable probability that, without counsel's unprofessional errors, the result would have been different. *Strickland*, 466 U.S. at 694. In determining whether counsel's performance was deficient, the defendant must show that

> "counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Chamberlain*, 236 Kan. at 656-57.

Here, the trial court conducted an evidentiary hearing on Betancourt's pro se motion. Under those circumstances, this court reviews any factual findings for substantial competent evidence and evaluates whether those findings support the trial court's conclusions of law. *In re Ontiberos*, 295 Kan. 10, 32, 287 P.3d 855 (2012); see *Thompson v. State*, 293 Kan. 704, 715-16, 270 P.3d 1089 (2011) (reviewing K.S.A. 60-1507 evidentiary hearing). The trial court's legal conclusions are reviewed de novo. See *State v. Gonzales*, 289 Kan. 351, 358-59, 212 P.3d 215 (2009).

*Lack of Communication*

At the evidentiary hearing on Betancourt's motion, his new counsel argued that trial counsel was ineffective because she failed to sufficiently communicate with Betancourt. Betancourt's new counsel implied that trial counsel's alleged lack of communication left trial counsel less than prepared for Betancourt's trial. Trial counsel

30

testified at the evidentiary hearing that she visited with Betancourt approximately seven or eight times before trial. Shortly before Betancourt's trial was to begin, trial counsel was involved in Alejandro's trial, which ran a bit longer than anticipated. Because of these demands, trial counsel told Betancourt's mother that she was not prepared for Betancourt's trial. But trial counsel requested a continuance of Betancourt's trial, and the trial court granted the continuance. Trial counsel testified that the continuance gave her the "breathing room" to get "geared up" for Betancourt's trial.

During trial counsel's meetings with Betancourt, they discussed, in part, the evidence and Betancourt's defense theory, which was that he had been drinking and recklessly fired bullets into the house. According to trial counsel, Betancourt agreed they should try to avoid a conviction for an off-grid offense—the classification for first-degree murder—and its corresponding life sentence; instead, they "were aiming for . . . second degree reckless" murder and a corresponding shorter sentence on the Kansas Sentencing Guidelines grid. See K.S.A. 21-4704. Trial counsel testified that she told Betancourt "if we're going to do a guilt-based defense, you have to agree with it, because I can't say you did something if you're not. And he understood . . . that our goal was to get him on the grid, ultimately." Trial counsel further stated: "I didn't feel like I needed more time with [Betancourt]. If I did, I would have said I need more time. Just like I asked for more time when I didn't have a trial done. . . . I felt like we had communicated. We were on the same page about our defense."

During trial counsel's testimony, Betancourt's new counsel produced jail records memorializing trial counsel's visits with Betancourt. New counsel suggested that trial counsel spent only 3 hours total with Betancourt. But trial counsel estimated that she spent approximately 1 hour with Betancourt on each of her seven or eight jail visits. There was nobody at the hearing who could interpret the jail records for the purpose of calculating trial counsel's total length of consultation time; hence, the time periods

31

corresponding to trial counsel's visits could not be independently calculated. Betancourt did not testify. Nor did Betancourt present any expert or other testimony establishing that trial counsel's efforts fell below an objectively reasonable standard.

After hearing this evidence, the trial court found that the evidence "is not sufficient to undermine this Court's confidence in the level of communication that [trial counsel] had with this defendant." Substantial competent evidence—specifically, the evidence we have just summarized—supports the judge's fact findings. Because trial counsel's performance was not deficient under the first prong of the *Strickland* test, there is no need to progress to the second, prejudice prong.

*Conflict of Interest*

Relying on *Galaviz*, 296 Kan. 168, Betancourt attempts to morph his lack of communication claim into a conflict of interests due to "multiple concurrent representations." Betancourt contends trial counsel's "duty to her other clients on her case load" created a conflict "in that her duties to other clients undermine[d] her ability to give sufficient attention to the interests" of Betancourt. He contends this conflict of interest rendered trial counsel per se ineffective. To qualify for this exception, Betancourt must establish several things, including that the trial court failed to investigate the conflict once Betancourt complained. *Galaviz*, 296 Kan. at 183 (discussing *Mickens v. Taylor*, 535 U.S. 162, 166, 122 S. Ct. 1237, 152 L. Ed. 2d 291 [2002]). Betancourt fails to meet this burden because the record establishes that as soon as Betancourt voiced an objection, the trial court appointed new counsel and conducted an evidentiary hearing.

*Galaviz* also recognized situations in which a defendant is entitled to a new trial for a conflict of interest in which a defendant can establish an adverse effect. In attempting to argue adverse effect, Betancourt notes that trial counsel admitted that she

32

requested a continuance to prepare for his trial and told Betancourt's mother that she was not ready to try Betancourt's case. But Betancourt ignores the fact that the continuance was granted, and trial counsel testified at the evidentiary hearing that the continuance gave her the "breathing room" she needed to get "geared up" for Betancourt's trial. The trial court apparently agreed. Although the trial court did not specifically consider a conflict of interest, the trial court essentially concluded there was no adverse effect from Betancourt's trial following soon after Alejandro's trial.

Again, substantial competent evidence supports that conclusion. The witnesses and evidence at the two trials overlapped. Trial counsel needed to shift gears to evaluate the different focus necessary to Betancourt's specific case, but she asked for and received that breathing room. Betancourt fails to cite an adverse effect, and the trial judge who observed counsel's trial performance did not note any. The bottom line is that Betancourt must show more than he has presented here.

*Failure to Consult Expert or Present Expert Testimony*

In Betancourt's final argument on appeal, he argues as he did in the district court that his trial counsel was ineffective for failing to consult an expert or present expert testimony regarding the effects of cocaine and alcohol. At the evidentiary hearing, Betancourt's new counsel presented the testimony of Dr. Mark Goodman, who opined that Betancourt "was unable to fully form the intent to commit [premeditated first-degree murder] because of his intoxicated state and not fully capable of thinking out the crime ahead of time."

Notably, however, the background information which Goodman used in arriving at his ultimate conclusion came entirely from Betancourt himself and Betancourt's new counsel. Goodman was told to assume that Betancourt had ingested both alcohol—

numerous shots of tequila chased with beer—and cocaine during the evening and early morning hours of the murder. Betancourt did not tell Goodman how much cocaine he allegedly used or how much alcohol he drank. And Goodman did not review any of the evidence from Betancourt's trial. Therefore, he was unaware that there was no evidence at trial suggesting that Betancourt had used cocaine on the night of the crime and he was unaware that Betancourt had never mentioned cocaine use to law enforcement officers or his trial counsel. Goodman testified at the hearing that even if Betancourt had not used cocaine, this factor would not have changed his professional opinion, as long as Betancourt's consumption of alcohol had been "excessive." But Goodman also acknowledged that he did not actually know whether Betancourt drank an excessive amount.

Betancourt's trial counsel testified that during her investigation of Betancourt's case and her discussions with him, she became aware that Betancourt had consumed beer and liquor at the party. And although trial counsel was aware that there was cocaine at the party, nobody, including Betancourt, said Betancourt was using cocaine, and no evidence suggested that he had. As reflected in Betancourt's statements during his police interrogation, when he was specifically asked if he was under the influence of any drugs, he replied, "No."

Trial counsel explained she was faced with Betancourt's statements to law enforcement regarding the amount of alcohol he had consumed, testimony from the arresting officer who observed Betancourt operating his car, and Betancourt's appearance in the recorded interview in which he did not "seem to be blotto or drunk." She concluded:

> "So there was a lot of evidence contrary to our defense that I think an expert would be hard-pressed to stand up on the stand when crossed with that video of how well

[Betancourt] is able to communicate, he's not throwing up, he's not dizzy, he doesn't have loss of memory. And then the fact that I have a trained law enforcement officer not consider a DUI at that time. So I have problems with an expert.

. . . And alcohol is one of those things where you can argue to a jury common sense. You know, use your common sense. And I had a lot of evidence that alcohol was there. . . ."

In ruling on this ineffective assistance argument, the trial judge noted that although there was evidence that Betancourt consumed alcohol, there was no evidence at trial showing that Betancourt used cocaine. The judge implicitly found that Goodman's opinion was not credible because his "opinions are only as good as all the underlying data" upon which they were based. See *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011) (appellate court does not reweigh evidence or determine credibility issues). The judge further found that Betancourt "had the ability to consciously think about getting out of the vehicle, walking past two or three houses, walking up to the door, pulling out a gun, pulling the trigger of the gun, and the alcohol did not affect that in any way." Also, "there's no evidence now with regard to the hearing today that the use of alcohol in any way affected his ability to form premeditation." The judge concluded: "I cannot find anything in the evidence presented here today with regard to the lack of communication or the failure to call an expert witness that leads the Court to believe anything other than . . . [trial counsel] did provide effective assistance."

Trial counsel's testimony establishes that she made a strategic choice after investigating the facts. "'Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than a complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. [Citation omitted.]'" *Rowland v. State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 (2009). In advancing his challenge on appeal, Betancourt fails to explain how trial counsel's

investigation was less than complete. In other words, he does not explain what more trial counsel should have done to gather relevant information before deciding whether to consult or present an expert. Nor does he establish that trial counsel's decision to refrain from seeking the services of an expert was unreasonable under the circumstances of this case.

Substantial competent evidence supports the trial court's finding that trial counsel was not deficient in failing to consult or present an expert on the effects of cocaine and alcohol. Under the circumstances, trial counsel's performance did not fall below an objective standard of reasonableness. Because trial counsel's performance was not deficient under the first prong of the *Strickland* test, there is no need to progress to the second, prejudice prong.

Affirmed.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]REPORTER'S NOTE:  Senior Judge Malone was appointed to hear case No. 108,944 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.