NOT DESIGNATED FOR PUBLICATION

No. 118,803

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GEORGE LOUIS FERENZ,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed November 9, 2018. Affirmed.

*Cooper Overstreet*, of The Swain Law Office, LLC, of Lawrence, for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., BUSER and SCHROEDER, JJ.

PER CURIAM: George Louis Ferenz—who was sentenced to life imprisonment without the possibility of parole for 25 years under Jessica's Law—appeals from the summary denial of his K.S.A. 2017 Supp. 60-1507 motion. On appeal, Ferenz contends that the district court erred by failing to hold an evidentiary hearing to determine whether his trial counsel was ineffective. However, based on our review of the record, we find that Ferenz failed to allege facts in his motion that, if true, would entitle him to relief. Instead, we find that Ferenz simply relied upon conclusory allegations. Thus, we affirm the district court's summary denial of Ferenz' K.S.A. 2017 Supp. 60-1507 motion.

1

The underlying facts relating to Ferenz' convictions were set forth by this court in *State v. Ferenz*, No. 111,156, 2015 WL 967582, at *1 (Kan. App. 2015) (unpublished opinion):

"When Ferenz met his future wife, Amanda, in the spring of 2009, she had a 4-year-old daughter, C.J. After Ferenz and Amanda married that September, they and C.J. lived together in Ogden, Kansas. In July 2010, Amanda gave birth to their son, B.F. Ferenz, who was in the Army, was deployed to Afghanistan from April 2011 until January 2012, during which time Amanda and the children left Kansas to stay with family. When Ferenz returned from Afghanistan, he was stationed at Fort Riley and the family moved into a house in Manhattan, Kansas.

"The house in which they lived had two bathrooms: a bathroom off the hallway, which the children used, and a bathroom adjoining the master bedroom, which Amanda and Ferenz used. Amanda later testified that she had never seen C.J. use the shower in the master bathroom and that there was no reason for her to do so. According to Amanda, when C.J. would shower, she did so in the hall bathroom and left the clothing she wore before the shower in that bathroom, where Amanda retrieved them. Amanda later testified that she did the family's laundry and Ferenz only washed his own clothes if he needed them the following day.

"After Ferenz returned from Afghanistan, Amanda's relationship with him was 'not so good'; they fought about their finances and her drinking. Amanda threatened to take C.J. and leave Ferenz and, at the beginning of October 2012, had purchased two bus tickets to do so. Ultimately, however, she did not leave and, after that, Amanda felt that their relationship was improving.

"On Sunday, October 21, 2012, Amanda went to work at 5 p.m. She returned home shortly after 1 the next morning, spoke briefly with Ferenz, and went to bed. According to Amanda's later testimony, the following morning when C.J. woke Amanda after Ferenz had left for work, Amanda noticed that C.J. was not wearing the clothes

2

Amanda had laid out for her the night before. Amanda asked C.J. about the clothes when she could not find them in C.J.'s room. C.J. explained that she was not wearing the clothes that Amanda had set out for her because she had worn the outfit the day before. Amanda thought this answer was strange because C.J. had been wearing pajamas when Amanda left for work the day before, so she asked C.J. why she had put on a clean outfit after 5 p.m. C.J. said that she did not know. Amanda checked the hall bathroom and the clothes hamper in the laundry room, but still could not find the clothes.

"Amanda again asked C.J. why the clothes were not in her bathroom if she had worn them the day before, and C.J. replied, 'Because I took a shower in your shower.' When Amanda asked C.J. why she showered in that shower, C.J. replied, 'Because I took a shower with [Ferenz].' Amanda attempted to clarify whether C.J. took a shower while Ferenz was in the bathroom or whether Ferenz was in the shower with her. C.J. stated that she took a shower with Ferenz and that they were both naked.

"Amanda later testified that she sat down on the bed with C.J. and asked her if Ferenz had touched her. C.J. responded that Ferenz had hugged her and 'tickled [her] private part.' Amanda asked C.J. if Ferenz had touched himself or asked her to touch his private part, and C.J. hid her face in the pillow and said, 'I can't tell you. It's a secret.' Amanda told C.J. that she should not keep secrets from her, and C.J. informed Amanda that Ferenz had 'asked [her] to tickle his private parts.'

*"Law enforcement investigation*

At this point, Amanda found a babysitter for B.F. and took C.J. to the police station. At the police station, Amanda spoke with Officer Carla Swartz of the Riley County Police Department. Swartz described Amanda as initially calm but stated that Amanda became distraught and upset as she related the morning's events. Swartz informed Detective Sonia Gregoire that Amanda was reporting possible inappropriate touching of a child by an adult, and Gregoire met with Amanda. Gregoire, Amanda, and C.J. left the police station and met at the Child Advocacy Center, where the Riley County Police Department prefers to interview children. Amanda gave Gregoire a brief overview of what had happened, and Gregoire interviewed C.J.; the interview was videotaped.

3

"During the interview, Gregoire and C.J. looked at body diagrams and C.J. referred to the vaginal area as a private part and a penis as a private part. C.J. acknowledged to Gregoire that people are not supposed to touch her private parts, but C.J. said that Ferenz had touched hers. When Gregoire asked to hear more, C.J. said, 'Like when we're taking a shower together' and told Gregoire that Ferenz had tickled her on her private part and her butt with his fingers the previous night while Amanda was at work. C.J. also told Gregoire that Ferenz had C.J. touch his private part, that water came out, and that it had to be a secret. C.J. informed Gregoire that Ferenz had put his private part inside her private part and inside her butt. C.J. said that Ferenz also had asked her the night before to touch his private part with her tongue while they were lying on the bed without any clothes.

"After the interview, Amanda, C.J., and a social worker went to Topeka for a physical examination. In the meantime, Gregoire contacted military police to have Ferenz report to the police station. Ferenz arrived around 11 a.m., and Gregoire conducted a videotaped interview with Ferenz. At the beginning of the interview, Ferenz stated he did not know what was going on; he was angry and felt that Amanda had lied and was using C.J. against him. After Gregoire read Ferenz his *Miranda* rights, he agreed to talk with her in more detail; he also consented and submitted to a DNA test.

"Ferenz repeatedly denied touching C.J. inappropriately. He explained that C.J. usually showered in her bathroom but had showered in his bathroom the previous night because he was using the hall bathroom. When Gregoire told Ferenz about C.J.'s specific allegations against him, Ferenz denied the allegations and said he did not know why C.J. would say such things. Ferenz stated that the previous night, he and C.J. had showered at the same time, but C.J. showered in the master bathroom and Ferenz in the hall bathroom. Later in the interview, Ferenz changed his statement to explain that C.J. showered first in the master bathroom because he was using her bathroom and then Ferenz showered in the master bathroom after C.J. finished her shower. Ferenz stated that after his shower he masturbated and was watching TV in his bedroom when C.J. came in to watch TV with him. Ferenz said that C.J. was wearing pajamas and he was only wearing shorts.

"Ferenz said that C.J. lay on the pillow next to him and put her head on his shoulder; he had his arm around her. Gregoire asked Ferenz if at any time he grabbed

4

C.J.'s breast or touched anywhere close to C.J.'s vagina, and Ferenz responded, 'Sure; I don't know. I didn't pay attention; probably. I would admit yes.' He said that 'maybe' he touched the outside or inside of C.J.'s pants and admitted that they did tickle each other but asserted that it was innocent, although his hand might have slipped as he tickled her inner thigh. Ferenz told Gregoire that when he accidentally touched C.J., he did so for a couple of seconds, then backed off because he 'knew [he] brushed it' as he was transitioning from tickling her leg to her hip. He stated that they tickled each other for approximately 5 minutes but maintained that C.J. never touched his penis. Ferenz also said that he pinched C.J.'s butt 'all the time' and had done so the previous night.

"During the interview, Ferenz also acknowledged that C.J. had once 'caught [him] watching porn' and that he had let her see maybe a minute of it, but 'it wasn't hardcore.' Ferenz stated he had been watching pornography on a computer when C.J. walked over and asked what it was; Ferenz told C.J. the woman was giving a blow job. While he admitted this, Ferenz still denied ever touching C.J. inappropriately.

"When asked if there was any way he could explain fluid on C.J.'s back, Ferenz stated that he probably touched his penis while cleaning it after masturbating, so when C.J. got onto the bed and he touched her back, he could have transferred semen onto her. Ferenz explicitly stated that he did not shower with C.J., he did not have her touch his penis, and he did not touch C.J. inappropriately. Finally, at the end of the recorded interview, Ferenz admitted that he had accidentally had child pornography on his computer and that he had searched for 'jail bait.'

"Meanwhile, Joy Thomas, the supervisor for the Sexual Assault Nurse Examiner program at Stormont–Vail Health Care in Topeka performed the sexual assault examination on C.J. Thomas noted more redness than she expected on C.J.'s genital area, and she took swabs from this area. Next, Thomas used a Wood's lamp to look for bodily fluids on C.J.'s body. She swabbed the area on C.J.'s back that fluoresced and sent the swabs for testing. At trial, the parties stipulated that the forensic testing found no seminal fluid or saliva on the swabs or in C.J.'s underwear. Thomas later testified that, overall, she felt her observations were consistent with the behavior C.J. reported; but on cross-examination, Thomas admitted she could not tell absolutely what had caused the redness.

5

"*Criminal prosecution*

On October 24, 2012, the State charged Ferenz with one count of rape, two counts of aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child. At the preliminary hearing, the district judge asked the State to explain the essential facts supporting each charge. The State conceded that there might not be enough evidence to support a rape conviction but argued there was enough evidence to support a charge of attempted rape; therefore, the State asked to amend the charge. Regarding the aggravated criminal sodomy charges, the State informed the judge that they were based upon C.J.'s mouth touching Ferenz' genitals and Ferenz' mouth touching C.J.'s genitals. The aggravated indecent liberties charges were based upon Ferenz touching C.J. in the shower and C.J. touching Ferenz in the shower. The district court bound Ferenz over on the charges as amended. The State later filed a bill of particulars which described the particular conduct on which it based each charge; the bill of particulars matched the prosecutor's statements at the preliminary hearing.

"On April 11, 2013, the State filed a motion to admit certain computer evidence pursuant to K.S.A. 60-455. The district court held a hearing on the motion and granted the State's request to admit the computer evidence. Specifically, the district court found that the probative value of the evidence outweighed its potential for prejudice.

"The jury trial began on September 10, 2013. The State presented evidence from Detective Alan Riniker of the Riley County Police Department, who had assisted with a search of Ferenz' home, photographing the residence and collecting items. Swartz, Amanda, Thomas, and Gregoire also testified, and the State introduced into evidence and played for the jury the interviews with C.J. and Ferenz.

"C.J. also testified. At the time of trial, she was 8 years old and in the third grade. As to the events in question, C.J. testified that she wanted to take a shower by herself, but Ferenz 'kept on begging and begging' her to take a shower with him while Amanda was at work and B.F. was sleeping. According to C.J.'s testimony, after Ferenz begged her, she said, 'Fine,' and took a shower with him. Although she testified that she and Ferenz were both naked, she stated that she did not remember what happened in the shower.

6

"C.J. testified that after the shower she wanted to get dressed, but Ferenz 'begged like five times' for her to lay down with him, so they lay down on his bed. C.J. testified that neither she nor Ferenz were clothed and '[t]here was some touching.' She stated that she touched his private part with her tongue and that he licked her private area. She also testified that Ferenz squirted something on her back; he told her it was water and wiped it off with a towel. Ferenz then told her, 'Don't tell anybody. It's a secret.'

"The State also presented evidence and testimony related to computer evidence. Officer Richard Lewis of the Riley County Police Department testified that he assisted in searching Ferenz' home on October 22, 2012, and photographed certain computer equipment in the house. Richard Nixon of the Platte County Sheriff's Department worked at the Heart of America Regional Computer Forensics Laboratory (HARCFL) and testified that he had examined the seized computers-a Gateway, a Lenovo, and a Dell. Nixon explained to the jury how computers store, save, and delete data and informed them that a computer file is generally named for the user's convenience so that the user knows what is in the file; he also explained that 'JPG' is a type of digital picture format and appears at the end of a file name if the file contains a digital picture.

"Nixon further testified that a file name can be changed and that even if a user deletes a file it may be possible to recover part or all of the file if the data has not been overwritten. Another possibility is that a forensic examiner could find evidence that a file previously existed—a file path—but not be able to physically retrieve the file's contents. Nixon explained that a file path is a way of organizing data on a computer to route files where they should go, similar to a residential address, which contains information about a street and house number.

"Nixon testified that the Riley County Police Department had requested that HARCFL examine the computers for 'incest-related activities,' among other things. On the Dell computer, Nixon found file paths to deleted files that he believed could be related to incest-related activity. Over Ferenz' objection, the State admitted 13 exhibits listing the file paths to which Nixon referred. Nixon testified that the file paths included the user-created folder name 'Geo's Folder,' which indicated that someone had placed the image in that folder to save it for possible future use. At the State's request, Nixon read each of the 13 file names into the record; the file names contained sexually explicit terms.

7

For example, one of the file names was 'BAMBINA–Collection 01 Real Child Porn!!! (illegal preteen underage lolita kiddy incest little girl rape anal cum sex lesb(l)(1).jpg.'

"On cross-examination, Nixon conceded that he did not know who had named the files and he had 'no way of knowing what this was a picture of.' He further testified, though, that he felt the file names were descriptive and that experience told him that 'more than likely it's gonna be what it says it is.' Further, Nixon conceded that he did not know who downloaded the files, when they were downloaded, how they were downloaded, or what information was in the files.

"After the State rested, Ferenz testified on his own behalf. Regarding the computer evidence, Ferenz testified that while he was deployed, Amanda took the Gateway to California where she and her mother both used it. He also testified that he had the Dell since 2004 and that an estimated 12 to 15 people had access to it over the years, including multiple roommates and others who would use it for video conferencing. Ferenz stated that he did not download the images that created the file paths to which Nixon testified and did not know how they got on the computers.

"Concerning the events of the night in question, Ferenz testified that Amanda left for work at approximately 4 or 4:30 p.m. They had all been relaxing in their pajamas that day, as was their custom on Sundays, but after Amanda left for work, C.J. and B.F. wanted to go outside. Ferenz told them to change because they could not go outside in their pajamas, so everyone got dressed and went outside. After about 90 minutes, they came inside and ate dinner. Between 7 and 8 p.m., Ferenz put B.F. to bed, after which Ferenz and C.J. hung out in the living room until C.J.'s bedtime. When it was time for C.J. to shower, Ferenz was using the hallway bathroom and realized he would be longer than he anticipated, so he yelled at C.J. to shower in the master bathroom. When Ferenz came out of the hallway bathroom, he went to check on C.J. and told her to hurry up.

"When C.J. finished showering, she went to her room and, as she got dressed in her pajamas, Ferenz showered in the master bathroom. After his shower, Ferenz masturbated and then lay down on his bed to watch TV. C.J. came into the master bedroom and asked if she could lay with him and watch a TV show. Ferenz testified that he and C.J. tickled each other and were having fun and 'goofing around.' He explained

8

that he stated during the videotaped interview that he bumped C.J.'s vaginal area because, during the interview, his mind was 'running a thousand miles a minute of just what's going on' and he never touched C.J. with any sexual intent.

"As to the statement he made during the interview about C.J. seeing pornography on his computer, Ferenz again testified that he was very nervous during the interview and he did not explain that situation well. He testified that he had been watching pornography on his computer in the living room and C.J. was in bed. He left the computer to get a drink and when he came out of the kitchen, C.J. was watching the computer and asked him about the pornography. He testified that he told her it was 'an adult video,' closed the computer, and shooed her out of the room.

"Regarding his statement at the end of the video that he had viewed child pornography on his computer, he explained that it was accidental and he had never searched for anything other than legitimate adult pornography. On cross-examination, he admitted that he had searched the term 'jail bait,' but he stated he had done so with the understanding that the term referred to adult pornography; he denied searching for or downloading any child pornography.

"Next, Ferenz called John Mallery, a computer forensics expert. Mallery testified that he had examined the three computers in this case and reviewed the HARCFL's report. Mallery further testified that he could not tell whether there were any photographs associated with the file paths at issue because no photographs were recovered. He deemed the file path evidence as 'essentially meaningless' because '[a]nyone can name a file anything [a]nd so without having the file to look at, the file name may not actually reflect the contents of what the original image contained.' Mallery explicitly testified that there was no way to tell who downloaded the files, when they were downloaded, how they were downloaded, or the contents of the files. He further testified that he had not encountered the term 'jail bait' in a case involving child pornography and that he felt it was an ambiguous term, not exclusive to child pornography.

"Finally, Ferenz called Staff Sergeant Dustin Peterson as a character witness. Peterson testified that he had known and spent a significant amount of time with Ferenz over the preceding 4 years, that he saw no indication of deviant sexual interests, and that

9

Ferenz had a reputation for being honest and truthful. He further testified about prior incidents in which Amanda had called him and attempted to get Ferenz into trouble.

"Prior to submitting the case to the jury, the State asked the district court to dismiss the attempted rape charge. The jury found Ferenz guilty of the four remaining counts. The jury also responded to a special question on the verdict form finding beyond a reasonable doubt that Ferenz was 18 years old or older at the time he committed the crimes. Ferenz filed posttrial motions for judgment of acquittal and for a new trial. He also filed a motion for a downward durational departure in which he asked the district court to depart to the sentencing grid and sentence him to a severity level 1 crime.

"Sentencing was held on October 21, 2013. The district court denied the motions for judgment of acquittal and for a new trial. At that point, Ferenz argued his motion for a departure sentence. After hearing a statement from Ferenz personally and listening to the State's arguments, the district court imposed concurrent sentences of life in prison without the possibility of parole for 25 years for each conviction under Jessica's Law. The district court also noted that upon release each conviction required lifetime parole. However, the journal entry of judgment indicated that Ferenz was subject to lifetime postrelease supervision. Ferenz timely appealed the district court's judgment." *Ferenz*, 2015 WL 967582, at *1-7.

In Ferenz' direct appeal, this court affirmed two of Ferenz' four convictions and reversed the other two convictions as multiplicitous. However, we did not remand the case for resentencing because the district court had ordered the sentences to run concurrent. 2015 WL 967582, at *10-11. In addition, the parties agreed that the lifetime postrelease supervision portion of Ferenz' sentence should be vacated as a matter of law. 2015 WL 967582, at *19. Subsequently, the Kansas Supreme Court denied Ferenz' petition for review and a mandate was issued on November 2, 2016.

On October 19, 2017, Ferenz filed a motion for habeas corpus in district court pursuant to K.S.A. 2017 Supp. 60-1507. In his motion and accompanying memorandum in support of the motion, Ferenz claimed that his trial counsel was ineffective for various

reasons. He also attached three exhibits: (1) Report of Joy Thomas, R.N., S.A.N.E.-A, S.A.N.E-P; (2) Report of Mark Goodman, psychologist, analyzing the video interview with C.J.; and (3) Report of Matthew Watters, the State's DNA expert.

On October 31, 2017, the State filed a response and requested that the K.S.A. 2017 Supp. 60-1507 motion be dismissed. In particular, the State argued that Ferenz' motion "fail[ed] to meet the threshold requirement for an evidentiary hearing" and consisted entirely of "conclusory contentions." From a review of the record, it does not appear that Ferenz replied to the State's request for dismissal. We also note that the K.S.A. 2017 Supp. 60-1507 motion was assigned to the same district court judge that had presided over the jury trial.

The district court summarily denied Ferenz' K.S.A. 2017 Supp. 60-1507 motion in an order filed on December 12, 2017. In its order, the district court summarized the ways in which Ferenz alleged that his trial counsel was ineffective:

1.      Failure to consult with an expert regarding child interview techniques and issues related to the credibility of children as witnesses.

2.      Failure to utilize expert testimony to rebut the opinions of the SANE/SART expert.

3.      Failure to consult an expert regarding potentially exculpatory DNA evidence.

4.      Failure to adequately investigate possible alternative perpetrators.

5.      Failure to adequately investigate Ferenz' claim of innocence.

6.      Failure to adequately cross-examine key witnesses at trial.

7.      Failure to challenge the competency and credibility of the child witness.

Regarding the first three claims, the district court noted that Ferenz had alleged no facts regarding what the consultation may have revealed that would have been helpful to his defense. The district court also pointed out that the parties stipulated at trial that the SANE nurse had not found any seminal or saliva fluid on swabs taken from C.J. or from her underwear. The district court explained that the only potentially prejudicial testimony offered by the SANE nurse concerned redness that she observed while examining C.J.'s genital area. However, on cross-examination, the SANE nurse clarified that she did not know the cause of the redness.

Concerning the remaining claims, the district court noted that Ferenz had alleged "[n]o facts, no names of witnesses and no names of alternative perpetrators" to support his conclusory statements. In particular, the district court asked, "What facts would lead trial counsel to question the child witness competency or credibility? None are alleged." The district court went on to explain that "[t]he dry words of a transcript do not convey how powerful and compelling the testimony of the child witness was to this jury." Finally, the district court determined that Ferenz' K.S.A. 2017 Supp. 60-1507 motion did not allege facts that, if true, would satisfy the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

ANALYSIS

The only issue presented on appeal is whether the district court erred in summarily denying Ferenz' K.S.A. 2017 Supp. 60-1507 motion. On appeal, Ferenz reduces his seven allegations of ineffective assistance of counsel down to two. First, he argues that his trial counsel was ineffective in failing to utilize expert testimony to rebut the testimony of the

SANE/SART nurse. Second, he argues that his trial counsel was ineffective in failing to present expert testimony regarding exculpatory DNA evidence. In response, the State contends that the district court did not err in summarily denying Ferenz' motion because it contained only conclusory statements rather than factual allegations.

Upon the filing of a K.S.A. 2017 Supp. 60-1507 motion, a district court has three options:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

Here, the district court exercised the first option and summarily denied Ferenz' K.S.A. 2017 Supp. 60-1507 motion because it determined that the motion, files, and record conclusively showed that he was not entitled to relief. When a district court summarily denies a K.S.A. 2017 Supp. 60-1507 motion, our review is de novo. Accordingly, we must also determine whether the motions, files, and records conclusively establish that the movant is not entitled to relief. *Sola-Morales*, 300 Kan. at 881.

To avoid the summary denial of a K.S.A. 2017 Supp. 60-1507 motion, a movant bears the burden of establishing that he or she is entitled to an evidentiary hearing. To meet this burden, a movant's contentions must be more than conclusory. In other words, either the movant must set forth an evidentiary basis to support those contentions in the motion or the basis must be evident from the record. If such a showing is made, a district

13

court is normally required to hold a hearing. See *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015).

Furthermore, Supreme Court Rule 183(c)(3) (2018 Kan. S. Ct. R. 224) provides:

> "A proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Mere trial errors must be corrected by direct appeal, but trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal, provided exceptional circumstances excuse the failure to appeal."

"Exceptional circumstances" include "'unusual events or intervening changes in the law which prevent a movant from reasonably being able to raise all of the trial errors in the first post-conviction proceeding.' [Citation omitted.]" *State v. Mitchell*, 297 Kan. 118, 123, 298 P.3d 349 (2013). Exceptional circumstances can include ineffective assistance of counsel. *Rowland v. State*, 289 Kan. 1076, 1087, 219 P.3d 1212 (2009).

To prevail on this claim of ineffective assistance of counsel, Ferenz must establish (1) the performance of defense counsel was deficient under all of the circumstances, and (2) prejudice, i.e., there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales*, 300 Kan. at 882 (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). In determining whether counsel's performance was deficient, the movant must show:

> "'[C]ounsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

14

assistance.'" *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015) (quoting *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 [1985]).

Here, Ferenz suggests that his trial counsel's failure to utilize an expert witness to rebut the testimony of the SANE/SART nurse was deficient. But, Ferenz fails to identify whom that expert might be or what that expert's testimony would be if called as a witness. Moreover, Ferenz has not alleged any facts that, if true, would show that he was prejudiced by his attorney's failure to utilize an expert. Of course, it is possible that another SANE/SART nurse may have agreed with Nurse Thomas' opinions. We simply do not know.

Additionally, a review of the trial transcript reveals that Ferenz' attorney extensively cross-examined Nurse Thomas while she was on the witness stand. During his cross-examination, trial counsel was able to elicit responses from Nurse Thomas that (1) she could not conclusively determine what caused the redness, (2) the redness could have resulted from an alternative cause, such as a chemical irritant, and that (3) no fissures or abrasions were present, which can be found in many abuse cases. Through cross-examination, Ferenz' trial counsel effectively obtained responses from Nurse Thomas that highlighted the uncertainty of the cause of the redness as well as its severity.

What is more, Ferenz' characterization that Nurse Thomas used the term "significant" in describing the redness is not accurate. In her report, Nurse Thomas details her findings as "*slight* redness to the posterior forchette and perineum." (Emphasis added.) During her direct testimony, Nurse Thomas stated that she "noted *some* redness in [C.J.'s] genital area" and explained that it "seemed like more than what I would normally expect—to see." (Emphasis added.)

Moreover, based on our review of the trial transcript, we find nowhere that Nurse Thomas ever used the term "significant" while testifying about the redness. In fact, it was

15

the prosecutor who used the word "significant" while questioning Nurse Thomas. However, when the transcript of Nurse Thomas' testimony is read in context, it is readily apparent that the prosecutor was not referring to the *amount* of redness noted but instead was referring to whether the fact she saw more redness than she would expect was significant to her as a SANE/SART nurse.

Specifically, this portion of the transcript reads as follows:

"Q: Okay. And so where did you note the redness on C[.J.], using the diagram?
"A: On the perineum, and I believe the posterior fourchette.
"Q: Okay.
"A: Which would be right in this area here.
"Q: Okay. And was that—the fact that that area was red, was that *significant* to you?
"A: The fact that there is—that it was red was not, but the amount of redness that I noticed seemed like more than what I would normally expect—
"Q: Okay.
"A: —to see."

Hence, it seems clear from the record that the prosecutor was simply asking Nurse Thomas whether the fact she found redness was significant to her as a SANE/SART nurse.

Finally, Ferenz suggests that his trial counsel was ineffective in failing to utilize exculpatory DNA evidence. In particular, Ferenz objects to the way in which his trial counsel addressed the fact that a liquid found on C.J.'s back was found not to be either semen or saliva. A review of the record reveals that the parties stipulated to certain facts at trial, including that "[n]o seminal fluid or saliva was detected on the labial swabs of C[.J.], the flank swabs, the rectal swabs, or the back swabs of C[.J.], or the underwear."

16

Evidently, Ferenz believes that the stipulation was not sufficient to "highlight" the fact that the fluid was not semen or saliva. However, Ferenz fails to explain exactly what else he feels was required or how it could have led to a different result at trial. Based on our review of the record, we see that the judge not only read the stipulation to the jury but also included it in the jury instructions. Furthermore, defense counsel spoke at length during closing argument about the "science" of the case and made it clear to the jury that the swabs did not show either semen or saliva. Thus, we find that the stipulation was both accurate and adequate to inform the jury that no semen or saliva had been recovered during C.J.'s physical examination or found on her underwear.

In summary, we agree with the district court that Ferenz has made only conclusory allegations in his K.S.A. 2017 Supp. 60-1507 motion. Likewise, we also note that Ferenz fails to articulate any "exceptional circumstances" to explain why he did not raise the alleged deficiencies of trial counsel in his direct appeal. As such, we conclude that Ferenz' K.S.A. 2017 Supp. 60-1507 motion, the files, and the records conclusively demonstrate that he is not entitled to relief. Therefore, the district court did not err in summarily denying Ferenz' K.S.A. 2017 Supp. 60-1507 motion.

Affirmed.