NOT DESIGNATED FOR PUBLICATION

No. 120,456

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

BONIFACE WAMBUTSI WABUYABO,
*Appellant.*


MEMORANDUM OPINION


Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed October 9, 2020. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant.

*Kendall S. Kaut* and *Shawn E. Minihan*, assistant district attorneys, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., GREEN and BUSER, JJ.


PER CURIAM: Boniface Wambutsi Wabuyabo timely appeals his conviction and sentence for reckless aggravated battery. He raises three issues on appeal: (1) The district court erred in admitting statements he made to law enforcement because the circumstances under which he was interviewed rise to the level of custodial interrogation for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (2) even if he was not in custody, the statements should have been suppressed as involuntary; and (3) the district court erroneously instructed the jury by stating it should find Wabuyabo guilty if it had no reasonable doubt as to each of the claims required to be

1

proved by the State, thereby negating the jury's inherent power of jury nullification. We agree the interview was custodial in nature and Wabuyabo's statements were involuntarily made. However, we find the State has met its burden to show these errors were harmless beyond a reasonable doubt under the constitutional harmless error standard. We further find the district court properly instructed the jury. Accordingly, we affirm.

FACTS

Wabuyabo was convicted by a jury of one count of reckless aggravated battery based on injuries suffered by his then two-month-old son, B.W. The State alleged Wabuyabo either shook B.W. or forcefully threw him onto a bed, causing severe head trauma.

At the time of the incident, Wabuyabo and his wife were both certified nurse assistants (CNAs) but worked opposite shifts. Wabuyabo worked an overnight shift—from 11 p.m. to 7 a.m.—and his wife worked from 2:30 to 10:30 p.m. On January 16, 2017, Wabuyabo returned home from work between 7:30 and 8 a.m. He went to sleep around 9 a.m. Around 12:30 p.m., Wabuyabo's wife ate lunch, fed B.W., and placed B.W. in the master bedroom so he could take a nap. Wabuyabo woke up around 2 p.m. when his wife went to work. B.W. was still asleep at that time. Between 4:30 and 5 p.m., B.W. began crying and flailing around on the bed. Wabuyabo had never seen B.W. behave this way. Wabuyabo tried to calm B.W. by carrying him around and by trying to feed him, but B.W. would not calm down and would not eat. At 7:15 p.m., Wabuyabo called his wife and told her B.W. was crying and would not eat. Shortly thereafter, B.W. became unresponsive and Wabuyabo tried throwing cold water on B.W.'s face to wake him up. This did not work, so Wabuyabo promptly called 911.

2

Police and paramedics arrived at Wabuyabo's home. Wabuyabo told one of the responding officers, Olathe Detective Kenton Thompson, he did not know how B.W. was injured. When Thompson suggested B.W. may have been shaken, Wabuyabo denied the accusation. Thompson then spoke with Wabuyabo's other children. Wabuyabo's 11-year-old son, N.W., told Thompson B.W. had been crying a lot. N.W. saw Wabuyabo carrying and trying to comfort B.W. Wabuyabo's six-year-old daughter, M.W., was difficult to communicate with and did not provide Thompson with any relevant information. Wabuyabo's four-year-old daughter, E.W., stated B.W. had been crying a lot. Although Thompson could not remember the direct quote, he recalled E.W. first saying something about her mother; then, when Thompson tried to clarify what she meant, E.W. "said something about a spider having done it." Thompson then spoke with Wabuyabo again, and Wabuyabo stated none of his children would have been alone with B.W. that afternoon.

B.W. was taken to the hospital where he was admitted and diagnosed with multiple injuries to his head, as well as a fracture to his left wrist. The diagnosing physician, Dr. Jennifer Hansen, believed the injuries to B.W.'s head were caused by violent acceleration and deceleration forces. On January 18, 2017, a different officer, Olathe Detective James McMillian, called Wabuyabo and asked if he would come to the police station for an interview. Wabuyabo agreed and met with McMillian at the police station on January 20, 2017. The interview lasted approximately two hours. During the interview, Wabuyabo denied hurting B.W. but told McMillian he would "accept" responsibility for B.W.'s injuries. Wabuyabo was not arrested at the end of the interview. Wabuyabo's wife came to the police station and picked him up.

Prior to trial, Wabuyabo moved to suppress his statements from the interview with McMillian. He argued the interview was custodial in nature and McMillian failed to give the required *Miranda* warnings. Alternatively, he argued his statements were involuntary under the totality of the circumstances. Following an evidentiary hearing, the district

3

court denied Wabuyabo's motion, finding Wabuyabo was not in custody and his statements were voluntary. At trial, Wabuyabo renewed his objections, which the district court overruled but granted a continuing objection.

The jury did not convict Wabuyabo of intentional aggravated battery as charged in the State's complaint but found him guilty of the lesser included offense of reckless aggravated battery. The district court sentenced Wabuyabo to 32 months' imprisonment. Additional facts are set forth as necessary herein.

ANALYSIS

Wabuyabo's first two issues relate to whether the statements he made to McMillian should have been suppressed. In reviewing a district court's decision regarding the suppression of a defendant's statements, the appellate court reviews the district court's factual findings under the substantial competent evidence standard. The district court's ultimate legal conclusion is reviewed de novo. The appellate court does not reweigh the evidence when applying this standard. *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017). This overarching standard of review applies to both issues. However, there are important distinctions between Issue I and Issue II, and the controlling analysis for these issues requires us to examine different factors for each.

The first issue relates to whether the interview itself was a voluntary encounter. If the interview was a custodial interrogation, not a voluntary encounter, then McMillian was required to give *Miranda* warnings prior to questioning Wabuyabo. Here, McMillian did not do so. The failure to give *Miranda* warnings would render Wabuyabo's statements subject to suppression as a violation of his constitutional rights against self-incrimination, irrespective of any specific coerciveness in the interview itself.

4

The second issue relates to the voluntariness of Wabuyabo's statements themselves, irrespective of the voluntariness of the encounter as a whole. That is, were Wabuyabo's statements the product of his free and independent will? Even when an encounter is not custodial in nature, the totality of the circumstances may still render the defendant's statements involuntary. See *State v. Harris*, 284 Kan. 560, 579, 162 P.3d 28 (2007). And involuntary statements cannot be admitted against a defendant at trial based on due process considerations under the Fifth and Fourteenth Amendments to the United States Constitution, as well as the defendant's constitutional rights against self-incrimination. See *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

Although the constitutional underpinnings of Issue I and Issue II are slightly distinct, the effect of the erroneous admission of evidence under either issue is not. Both issues implicate Wabuyabo's constitutional rights and relate to the same statements made during his interview with McMillian. Any error in the admission of evidence under either issue would be subject to an identical constitutional harmless error analysis. Based on our analysis, we consider harmless error jointly as further discussed below.

I.      *Wabuyabo was subject to a custodial interrogation.*

Wabuyabo argues the district court erred in admitting his statements to McMillian because McMillian did not advise Wabuyabo of his *Miranda* rights prior to conducting the interview. Wabuyabo had not been arrested at the time of the interview, but he claims the totality of the circumstances demonstrate he was in custody for purposes of *Miranda*. We agree.

"The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent." *State v. Walker*, 276 Kan. 939, 944, 80 P.3d

5

1132 (2003). The Fifth Amendment protections under *Miranda*, 384 U.S. at 444, attach "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Subsequent United States Supreme Court "cases instruct that custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 [1984]).

> "An appellate court reviews a trial court's determination whether an interrogation was custodial employing two distinct inquiries. Under the first, the appellate court decides the circumstances surrounding the interrogation, employing a substantial competent evidence standard of review. In determining if there is substantial competent evidence supporting the existence of the circumstances found by the trial court, an appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The second inquiry employs a de novo standard of review to determine whether, under the totality of those circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter." *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014).

Factors a court may consider in analyzing the circumstances of whether the interrogation is custodial in nature include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No one factor outweighs another, nor do the factors bear equal

weight. Every case must be analyzed on its own particular facts. *Lewis*, 299 Kan. at 835; *State v. Warrior*, 294 Kan. 484, 496, 277 P. 3d 1111 (2012).

A.  *The time and place of the interrogation*

The interrogation took place at the Olathe Police Station beginning around 9 a.m. on January 20, 2017. Citing *Yarborough*, 541 U.S. at 665, Wabuyabo argues the fact the interview took place in a police station generally weighs in favor of custody. But he also argues the fact the interview room was located far from the lobby of the police station weighs more heavily in favor of custody because he had to go through at least three locked security doors to get to the interview room. Wabuyabo does not argue the time of day weighs in favor of custody. However, he asserts the timing of the interview, generally, weighs in favor of custody because the interview occurred the day after Wabuyabo's other children were removed from the home and taken into state custody.

Overall, this factor weighs in favor of custody. Wabuyabo correctly points out the location of the interview—a police station—somewhat favors custody. A reasonable person in Wabuyabo's circumstances likely would not have felt as free to terminate the encounter and leave a police interview room as he or she would if the interview had taken place on the street or in the person's own home. Wabuyabo's argument about the specific location of the interview room behind at least three locked doors deep within the police station is also persuasive. A reasonable person, after having gone through the locked doors requiring the use of McMillian's security keycard, likely would not have felt free to terminate the interview and to leave the interview room as he or she would have if the interview room was just past the public lobby and required no special means to enter or leave.

The actual time of the interview—9 a.m. on a Friday—does not seem to weigh in favor of custody. This time falls within normal business hours for most public agencies.

7

Wabuyabo offers no reason the time of day itself would weigh in favor of custody for himself or any reasonable person. Wabuyabo's argument has to do with the *timing*, not the time, of the interview, which may be relevant under other factors or as a general consideration under the totality of the circumstances. But it does not seem to be relevant to this specific factor.

B.     *The duration of the interrogation*

A video recording of the interview shows it lasted approximately two hours. In support of his argument, Wabuyabo again cites *Yarborough*, 541 U.S. at 665, where the Court found a two-hour interview weighed in favor of custody. The State argues the duration of the interview does not favor custody and cites *State v. Walker*, 308 Kan. 409, 422, 421 P.3d 700 (2018), in support of its argument.

In *Walker*, our Supreme Court held that a 30-minute interview after a defendant had been in custody for 3 hours was not unreasonable. But the *Walker* court stated: "Even if we combine these times, the period remains shorter than many other periods of interrogation we have found voluntary." 308 Kan. at 422. *Walker* then discussed *State v. Harris*, 293 Kan. 798, 269 P.3d 820 (2012), and *State v. Brown*, 258 Kan. 374, 904 P.3d 985 (1995), as support for its decision. *Walker*, 308 Kan. at 422. In *Harris*, our Supreme Court held a confession was voluntary where a defendant waited in an interview room for a little over 3 hours before being questioned for 90 minutes. 293 Kan. at 809. In *Brown*, a confession was deemed voluntary where a defendant was in custody for four hours before being questioned for two and a half hours. 258 Kan. at 392-95.

The actual interview in *Brown*—two and a half hours—was longer than McMillian's two-hour interview of Wabuyabo. The actual interviews in *Walker*—30 minutes—and *Harris*—90 minutes—were shorter. Still, *Walker* clearly indicated even a three-and-a-half-hour interview would not have been excessive. 308 Kan. at 422. *Brown*

8

does not conflict with *Yarborough*'s apparent suggestion a two-hour interview weighed in favor of custody. However, *Walker* and *Harris* seem to conflict with a strict, literal reading of *Yarborough*, 541 U.S. at 665. But *Yarborough* is likely not as determinative to this issue as Wabuyabo suggests.

*Yarborough* addressed whether, or more pertinently, when, "[u]nder the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a federal court can grant an application for a writ of habeas corpus on behalf of a person held pursuant to a state-court judgment." 541 U.S. at 655. *Yarborough* made clear such relief was only available "if the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." 541 U.S. at 655. *Yarborough* was largely grounded in federal statutory interpretation, albeit with a fairly thorough general overlay of applicable United States Supreme Court Fifth Amendment precedent under *Miranda*. But *Yarborough* did not definitively decide whether the defendant was in custody for purposes of *Miranda*. Rather, the question was whether "the state-court adjudication of the claim 'involved *an unreasonable application*' of clearly established law when it concluded [the defendant] was not in custody. 28 U.S.C. § 2254(d)(1)." (Emphasis added.) 541 U.S. at 663.

*Yarborough* noted "whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." 541 U.S. at 664. The *Yarborough* Court then stated: "[I]t can be said that fairminded jurists could disagree over whether [the defendant] was in custody." 541 U.S. at 664. The Court concluded: "Although the question of what an 'unreasonable application' of law might be is difficult in some cases, it is not difficult here. The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions." 541 U.S. at 665. In other words, *Yarborough*'s discussion of the factors weighing in favor or against custody merely

9

illustrated other courts could reach differing, but nonetheless reasonable, conclusions. 541 U.S. at 664-45.

Specific to Wabuyabo's contention on this issue, *Yarborough* stated: "The interview lasted two hours, four times longer than the 30-minute interview in [*Oregon v.*] *Mathiason*[, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]." 541 U.S. at 665. *Yarborough* then discussed this statement in its overall context with other important distinctions from *Mathiason*. Collectively, *Yarborough* reasoned those factors could weigh in favor of finding the defendant was in custody. See 541 U.S. at 665. But *Yarborough*'s earlier discussion of factors potentially weighing against a finding the defendant was in custody was also premised almost exclusively on comparison of the facts to *Mathiason*. See 541 U.S. at 663-66.

Read in its overall context, particularly in light of its procedural posture, *Yarborough* appears to have used *Mathiason* simply to illustrate the general analytical framework dictated by *Miranda*. See 541 U.S. at 663-65. *Yarborough* cannot be intelligently construed as holding the facts discussed therein definitively weigh in favor of or against a finding of custody under *Miranda*. Instead, *Yarborough* only demonstrates the state court's decision was "reasonable" *within the meaning of* 28 U.S.C. § 2254(d)(1), and the state court's decision was "reasonable" because reasonable *competing interpretations* could be derived from the facts. See 541 U.S. at 663-66.

*Yarborough* does not support Wabuyabo's contention a two-hour interview definitively weighs in favor of custody. But *Yarborough*'s discussion of the length of the interview *in context with other relevant facts* seems to generally support Wabuyabo's more specific argument that the length of the interview here weighs in favor of custody, "given the aggressive and confrontational interrogation techniques used by McMillian." See 541 U.S. at 665. Wabuyabo generally appears to be on more solid legal footing with his citation to *State v. Boyle*, No. 104,521, 2011 WL 420738, at *3 (Kan. App. 2011)

(unpublished opinion) ("[T]he duration of at least 45 minutes, involving two police officers, the clear determination at the outset that Boyle was a suspect, and the resulting arrest of Boyle, coupled with the statements threatening SRS custody of his children, must be viewed as weighing in favor of a custodial interrogation."). But the cited proposition from *Boyle* goes to a custody determination in light of all relevant factors as a whole. Here, the length of the interrogation does not definitively weigh in favor of or against custody; its effect can only be properly assessed under the totality of the circumstances.

## C.    *The number of officers present*

Wabuyabo concedes "during the actual interrogation, McMillian was the only officer present for most of the interview." Nevertheless, he asserts other circumstances demonstrate this factor weighs in favor of custody. Specifically, Wabuyabo points to the fact another officer entered the interview room and had Wabuyabo perform a preliminary breath test (PBT). The video recording shows this happened a little more than an hour and a half into the interview. The video further shows McMillian asked for and obtained Wabuyabo's consent to the PBT.

Wabuyabo does not assert, nor does the video reflect, the other officer asked him any questions relevant to the specific subject of McMillian's interrogation—the injuries to B.W. The video shows the other officer was present for less than two minutes and only for the purpose of conducting the PBT. Wabuyabo does not argue conducting the PBT was inherently improper. He has not shown the brief presence of the second officer favors custody.

Wabuyabo further argues the fact McMillian told him other officers were simultaneously watching the video of the interview weighs in favor of custody. His argument on this point is poorly explained, unsupported by citation to authority, and

11

generally unsound. Although he does not explicitly argue the point, Wabuyabo has, at most, asserted other officers were *constructively* present. But nothing about the fact other officers were potentially watching the interview remotely means they (1) were physically present during the interview; (2) meaningfully participated in the interview; or (3) would have impeded his ability to terminate the interview.

Contrary to Wabuyabo's argument, the fact that any reasonable person in his circumstances would have known other officers were present in the police station at the time of the interview does not render the interview custodial in nature. Absent some indication those other officers would interfere if the person tried to leave, it has no effect on how a reasonable person would perceive the ability to terminate the interview. Although it is not even clear he is trying to argue the point, Wabuyabo offers no persuasive argument why officers who were remotely watching the interview from elsewhere in the police station would potentially interfere with his ability to leave than would other officers generally present in the police station.

The recording of the interview reflects McMillian was the only officer physically present during the interview except for the brief time—less than two minutes—that another officer came in to conduct the PBT. The other officer did not question Wabuyabo in relation to McMillian's questioning, and the other officer was not present at the time Wabuyabo ultimately said he "would accept" he injured B.W. Wabuyabo offers no clear, much less persuasive, argument why the presence of other officers in the police station— not in the interview room itself—weighs in favor of custody. Here, we observe this factor does not weigh in favor of custody.

D. *The conduct of McMillian and Wabuyabo*

Wabuyabo argues his conduct and McMillian's conduct during the interview weighs in favor of custody. Wabuyabo particularly focuses on the fact McMillian used

12

Wabuyabo's children to elicit a confession, took an accusatory tone with Wabuyabo, raised his voice, and used profanity. These facts are concerning and have some relevance to this issue. However, they have much greater bearing on the voluntariness of Wabuyabo's statements as further discussed in Issue II. Relevant to this issue, these facts generally establish McMillian controlled the tone and direction of the interview.

Wabuyabo acknowledges, however, that near the beginning of the interview McMillian informed Wabuyabo he was not under arrest "right now"; he was there "voluntarily"; he would not be arrested at the conclusion of the interview; Wabuyabo came there on his own and would be allowed to leave on his own; the interview was voluntary; and Wabuyabo did not "have to speak with [him] if [he didn't] want to." But Wabuyabo argues McMillian's brief attempt to render the interview voluntary at the outset "cannot override his conduct during the remaining nearly two hours of the interrogation." Again, the conduct Wabuyabo complains of goes largely to the fairness of McMillian's interview techniques, which is significantly more relevant to Issue II.

With respect to his own conduct, Wabuyabo claims he "did not decide to come to the police department on his own initiative—he came at McMillian's request." Wabuyabo is correct on this point. However, during a phone call McMillian and Wabuyabo agreed on a date for him to come to the station based on Wabuyabo's schedule. Ultimately, the meeting was something Wabuyabo agreed to upon McMillian's request.

Wabuyabo is also correct that upon his arrival at the police station McMillian led him to the interview room deep in the station through at least three locked doors McMillian had to open with his security card. In fact, McMillian testified he had "to escort [Wabuyabo] all the way back through the maze" to get from the public lobby to the interview room. McMillian estimated they had to walk "a couple hundred yards" to get from the lobby to the interview room through three security doors requiring his security keycard. Wabuyabo is also correct that, at various times, McMillian left the interview

room and told Wabuyabo to "sit tight." In response, Wabuyabo stayed in the interview room each time McMillian left.

The circumstances under which Wabuyabo got from the lobby to the interview room show McMillian was in control of the literal direction of the interview. The overall nature of McMillian's conduct also shows McMillian was in control of the figurative direction of the interview. However, Wabuyabo never explicitly asked to leave or end the interview. And throughout the interview, Wabuyabo retained possession of his cell phone and could have called his wife to pick him up—if he could have found his way out—but did not do so until the conclusion of the interview. Wabuyabo had also been advised—albeit very briefly—at the outset of the interview that he did not have to answer McMillian's questions and could leave if he wanted to. In an extremely literal sense, however, Wabuyabo could not leave whenever he wanted to; McMillian would have had to escort him through the secured areas to the exit. But Wabuyabo never indicated he wanted to leave, and McMillian never specifically told Wabuyabo he could not leave.

Looking at the overall nature of Wabuyabo and McMillian's actions, McMillian's actions reflect he exerted a strong degree of control over the interview. But Wabuyabo's actions (or inactions) reflect he had the general means and opportunity to end the interview but made no clear attempt to do so. Still, we note Wabuyabo generally appeared submissive and deferential throughout the interview. This factor weighs in favor of custody.

E.    *The presence or absence of actual physical restraint or its functional equivalent*

While Wabuyabo concedes he was not restrained by handcuffs during the interview, Wabuyabo claims this factor weighs in favor of custody based on other circumstances. He contends McMillian "openly displayed his sidearm during the

14

interrogation." While McMillian did have his sidearm on his person at the time of the interview, McMillian did not remove the weapon from its holster, much less brandish it or point it at Wabuyabo. Reasonable people might expect a police officer to carry a firearm while on duty. But, in conjunction with the tense overall nature of the interrogation, we believe this may add slightly to a finding of custody given McMillian's aggressive demeanor and control throughout.

Wabuyabo further contends "during the interview, McMillian ordered him to remain in the room whenever he left, saying 'sit tight' or 'sit down.'" Wabuyabo is correct McMillian made statements to that effect three separate times when McMillian got up to leave the room. However, based on the context in which they were made, McMillian's statements appear only to indicate McMillian was going to return to the room. In fairness to Wabuyabo, the fact McMillian made these repeated statements and Wabuyabo complied further supports a finding McMillian controlled the interview, but that goes more to the previous factor regarding the conduct of McMillian and Wabuyabo.

Wabuyabo finally asserts: "[W]hen one examines how [Wabuyabo] was only allowed to leave by being shepherded by McMillian, he was effectively restrained in the interview room." There is some merit to Wabuyabo's point. A reasonable person in his circumstances would not have felt free to walk out of the interview room and figure out how to get out of the building through the locked doors. This appears to constitute some increased level of constructive restraint. But this fact has stronger bearing on the first factor regarding the location of the interview. Wabuyabo has shown this factor generally weighs in favor of custody.

F.      *Wabuyabo was questioned as a suspect*

The State concedes Wabuyabo was questioned as a suspect. This factor weighs in favor of custody.

15

G. *How Wabuyabo arrived at the location of the interview*

Wabuyabo was not transported to the interview location by police. Wabuyabo agreed to the interview time and arrived at the interview location by his wife driving him there. Contrary to Wabuyabo's arguments, the fact McMillian led him a considerable distance through the police station to the interview room does not affect the circumstances under which Wabuyabo arrived. Wabuyabo's argument has some bearing on the first factor. But this factor does not, on its own, weigh in favor of custody.

H. *The result of the interrogation*

Wabuyabo was not arrested when the interrogation ended. McMillian and Wabuyabo left the interview room at approximately 10:58 a.m., and Wabuyabo was allowed to leave the police station after the interview ended. Wabuyabo retained possession of his cell phone and called his wife to pick him up. However, McMillian arrested Wabuyabo at his home around 11:45 a.m. that same morning. Given the closeness in the time of the arrest, this factor weighs in favor of custody, but not as strongly as it would if Wabuyabo had been arrested at the police station.

I. *Totality of the circumstances*

This issue is somewhat deceptive because of the analytical tension and overlap between the nature of McMillian's conduct as it *specifically* applies to the voluntariness of Wabuyabo's *statements* and *generally* applies to the voluntariness of the *interview* itself. As more fully explained below, McMillian's interview techniques render Wabuyabo's statements involuntary. But that does not necessarily mean Wabuyabo was improperly coerced into attending the interview to begin with or continuing to answer McMillian's questions. Simply put, this issue turns on how and why Wabuyabo showed up and why he stayed, not why he said the things he said while he was there.

16

Under the totality of the circumstances, the time and location of the interview weigh somewhat in favor of custody. However, nothing about the time of the interview itself weighs in favor of custody. The fact the interview was at the police station weighs in favor of custody, but this is undercut by the fact Wabuyabo agreed in advance to meet McMillian at the police station. Wabuyabo could have declined to meet with McMillian altogether or asked to meet at a different location. The specific location of the interview room weighs more strongly in favor of custody because it required Wabuyabo to follow McMillian through the police station a considerable distance from the public lobby. McMillian also had to unlock three secured doors between the lobby and the interview room.

Wabuyabo was clearly questioned as a suspect, which weighs in favor of custody. The significance of this factor is somewhat lessened because McMillian told Wabuyabo he was not under arrest when the interview began and he would not be arrested at the conclusion of the interview. And Wabuyabo was not, in fact, arrested at the conclusion of the interview. Wabuyabo was allowed to leave the police station after the interview. However, McMillian arrested Wabuyabo at his home approximately 45 minutes after the conclusion of the interview. Under the totality of the circumstances, these factors weigh in favor of custody.

Wabuyabo was not restrained with handcuffs during the interview, there was no guard posted by the door, and for all but two minutes of the interview, McMillian was the only officer in the interview room. McMillian had his sidearm on his person during the interview but did not brandish it or point it at Wabuyabo. These facts generally would not weigh in favor of custody. But again, we note the specific location of the interview room within the police station and McMillian's demeanor throughout the interview weigh in favor of custody.

The circumstances under which Wabuyabo agreed to meet with McMillian and later arrived at the police station weigh against custody. The length of the interview does not, standing alone, weigh in favor custody. But, based on McMillian's generally accusatory tone throughout the interview, occasional use of profanity, and continued references to Wabuyabo's children, the duration of the interview favors custody considering its overall manner. McMillian's actions show he strongly controlled the direction of the interview, but this is offset by Wabuyabo's actions or inaction during the interview. Collectively, the duration and manner of the interview and the actions of McMillian and Wabuyabo throughout favor custody.

Considered in the totality of the circumstances, the factors favoring custody outweigh the factors supporting a finding the interview was voluntary. The district court erred in admitting Wabuyabo's statements based on McMillian's failure to give *Miranda* warnings. Accordingly, we must consider whether the error was prejudicial. However, because we apply the same constitutional harmless error analysis discussed in Issue II, we will discuss harmless error collectively therein.

II.     *Wabuyabo's statements to Detective McMillian were involuntary*.

Regardless of whether *Miranda* applies, a defendant's statements must be excluded if they were involuntarily made. See *Harris*, 284 Kan. at 579. The State has the burden to prove by a preponderance of the evidence that a defendant's statement was voluntarily made. *State v. Bridges*, 297 Kan. 989, 1004, 306 P.3d 244 (2013).

Our Supreme Court has set forth the following nonexclusive factors to use in making this determination:  (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the

18

English language. *State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015). But those factors are nonexclusive and cannot be reduced to a neat set of legal rules or perfunctory checklist by way of judicial arithmetic. See *State v. Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015) ("Any one factor or a combination of factors '"may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." [Citations omitted.]'"). But before examining the application of these factors, some additional factual explanation is needed.

At the time of the interview, B.W. was still hospitalized and receiving either testing or treatment for his injuries, and Wabuyabo's other children had been taken into protective custody three days before. While Wabuyabo's interview with McMillian was recorded, the recording of the video was not admitted at trial. But many of the statements made during the interview were admitted through McMillian's trial testimony. The video was, however, admitted at the suppression hearing, and the district court reviewed the video in its entirety prior to ruling on the motion. Particularly relevant to the voluntariness of Wabuyabo's statements are the following exchanges between McMillian and Wabuyabo as reflected in the video:

> "McMillian: Where are your kids at right now?
> "Wabuyabo: I don't know.
> . . . .
> "McMillian: Should they be with a parent?
> "Wabuyabo: They should.
> "McMillian: Should they be with their mom?
> "Wabuyabo: They should.
> . . . .
> "McMillian: You know who can change that? . . . You. You can change that.
> You understand that? . . . By accepting responsibility, putting yourself after your
> children.
> . . . .

19

"McMillian:  Right now, your kids aren't even with their mom and dad. Why? Because you hurt [B.W.]

"Wabuyabo:  No, I didn't.

"McMillian:  Okay? And . . . if you want your children to at least be reunited, at some point, with your wife, the only way for that to happen is for you to accept responsibility and tell me the truth about what happened.

"Wabuyabo:  I can't. I cannot accept what I didn't do. I can't. And that's my principles. So.

"McMillian:  Well, when your children are going to take the brunt of that. You're putting yourself before your kids. I don't know how else to tell you.

"Wabuyabo:  But why should I accept what I didn't do? . . .

"McMillian:  Here we are confronted with the issue that you hurt your son.

"Wabuyabo:  I did not.

"McMillian:  Alright. Your children are in some other home. You don't even know if they're together, brothers and sisters. They could be in four different homes. You don't know that. Nor will you know that. Okay?

"Wabuyabo:  I didn't make that decision.

"McMillian:  Your kids need their parents.

"Wabuyabo:  I did not make that decision. Somebody else did.

"McMillian:  You're right. Because of what you did.

"Wabuyabo:  I did not do.

"McMillian:  And—

"Wabuyabo:  —That's why I said—

"McMillian:  You have to accept that, and until you're ready to put your kids before yourself, then this is going to continue to be an issue."

McMillian later told Wabuyabo:

"I'm trying to give you the benefit of the doubt here. . . . I'm trying to help you. I'm trying to help you through this. But by lying and not telling me the truth of all the surrounding events around this injury, it's making it worse for you, and it's gonna make it worse for your family and your children. . . . And you're putting yourself before your kids. You're not trying to help me understand."

Later in the interview, Wabuyabo told McMillian: "Let me accept. Let me accept. Cut this story short. Let me just accept." But the interview continued for roughly 40 more minutes. And during this time, Wabuyabo maintained he never hurt B.W. Thereafter, Wabuyabo finally told McMillian:

"For the sake of my kids, I'll have to accept. For the sake of my kids, I'll have to. There's no other solution. I'll have to. But for [my wife], she knows me, she knows who I am. She'll understand what can come from me and what cannot come from me. She will."

But Wabuyabo did not explicitly admit to harming B.W. or provide any specifics as to how B.W.'s injuries occurred. This is reflected in the following exchange between McMillian and Wabuyabo near the end of the interview:

"McMillian: And you're not helping [B.W.] out at this point so I can talk to the doctors.
"Wabuyabo: I tried to accept so that I [could] help him out. I had to accept. That's the only way I can help him."

With these additional facts in mind, Wabuyabo's statements to McMillian that he accepted responsibility for B.W.'s injuries were involuntarily made and should have been suppressed. The most significant factors at issue are the fairness of McMillian's interview techniques and how those techniques substantially exploited Wabuyabo's subjective mental state under the totality of the circumstances. With this understanding we move to consider the relevant factors under *Woods*, 301 Kan. at 867.

A.	*The* Woods *factors*

1.	*Wabuyabo's mental condition*

As Wabuyabo argues, he had just undergone two very objectively traumatic events at the time of the interview. B.W. had apparently been seriously injured and was in the hospital receiving testing or treatment, and, as a result of B.W.'s injuries, Wabuyabo's three other children had been removed from his home. Wabuyabo does not, however, point to any facts suggesting he had some general mental impairment at the time of the interview. And there were no concerns Wabuyabo suffered from mental deficiencies, was impaired, or did not understand what was going on during the interview.

Wabuyabo's argument on this point is clearly limited to an assertion that McMillian took advantage of his subjective mental condition at the time of the interview in order to coerce Wabuyabo's statements. This strongly ties in with McMillian's fairness in conducting the interview and the duration and manner of the interview. Wabuyabo's arguments for this factor cannot be neatly compartmentalized from his arguments regarding those other factors. But this factor likely weighs heavily in favor of finding Wabuyabo's statements were involuntary. Any reasonable person would have been concerned if his or her child was either hospitalized *or* taken into state custody. Here, Wabuyabo experienced both, the second as a direct consequence of the first.

Certainly, a reasonable person in Wabuyabo's position would have had extremely serious concerns about the wellbeing of his or her children. And these concerns would have been greatly exacerbated when a questioning officer repeatedly suggested taking responsibility for the injuries of one child was necessary to (1) help the injured child and (2) ensure the timely return of the other children. The way McMillian repeatedly and jointly exploited these two concerns in his questioning of Wabuyabo was meaningfully more coercive in the aggregate than the sum of the individual parts.

22

### 2. *The manner and duration of the interrogation*

As previously discussed, the relevant facts generally establish McMillian controlled the tone and direction of the interview and was accusatory throughout the two-hour interview. The duration of the interview itself does not particularly undermine the voluntariness of Wabuyabo's statements, but the manner of the interrogation does. McMillian repeatedly accused Wabuyabo of being untruthful and buttressed his accusations and statements of disbelief with reference to Wabuyabo's children.

Peppered in with these statements was the occasional use of profanity by McMillian and/or McMillian raising his voice when Wabuyabo denied his accusations. At one point, McMillian told Wabuyabo he thought his answer was "bullshit." McMillian later raised his voice, demanding: "Tell me what happened! I want to know the damn truth about what was going on when [B.W.] got hurt." As our Supreme Court recently explained in *State v. Guein*, 309 Kan. 1245, 1264-65, 444 P.3d 340 (2019), the use of profanity in an aggressive context can weigh in favor of finding a defendant's statement involuntary. Granted, McMillian's actions here were not nearly as aggressive as the officer's in *Guein*. See 309 Kan. at 1264-65. Nonetheless, McMillian's comments amid repeated references to Wabuyabo's children—comments that appear clearly targeted at eliciting an incriminating response—weigh in favor of involuntariness. Cf. *Boyle*, 2011 WL 420738, at *3.

### 3. *Wabuyabo's ability to communicate with the outside world*

Wabuyabo retained his cell phone throughout the interview. Nothing about the circumstances of the interview reasonably demonstrate Wabuyabo could not have called his wife—or anyone else—and McMillian never suggested he could not do so, much less actually prevented him from doing so. This factor weighs in favor of voluntariness.

### 4.    *Wabuyabo's age, intellect, and background*

Wabuyabo was 41 years old at the time of the interview. He worked as a CNA, which requires medical training that he had, in fact, completed. Wabuyabo lived in Kenya until shortly after the birth of his daughter, N.W., who was six years old at the time of the interview. Wabuyabo appeared to be intelligent and aware of the overall nature of the interview with McMillian. He answered McMillian's questions clearly and appropriately. This factor weighs in favor of voluntariness.

### 5.    *McMillian's fairness in conducting the interrogation*

As previously discussed in the first and second factors, McMillian was very unfair in conducting the interview. This factor strongly ties in with those factors to the point they are virtually inseparable. The collective effect of these factors was extremely coercive. Accordingly, this factor weighs strongly in favor of involuntariness.

### 6.    *Wabuyabo's fluency with the English language*

When McMillian called Wabuyabo about meeting with him, they spoke in English. It appears Wabuyabo had no difficulty understanding McMillian, and McMillian had no difficulty understanding Wabuyabo. Wabuyabo also had no difficulty communicating with McMillian during the interview. Wabuyabo never indicated he was unable to understand McMillian and never requested an interpreter. At the time of the interview, Wabuyabo had been living in the United States for approximately six years. However, McMillian never offered Wabuyabo the option of an interpreter. The record reflects McMillian knew Wabuyabo was from Kenya. The record also reflects English was not Wabuyabo's primary language, and the video of the interview demonstrates Wabuyabo spoke with a fairly strong accent. Although Wabuyabo had not been formally arrested, we have previously found he was in custody and believe he should have been

offered an interpreter. See K.S.A. 75-4351(e); *State v. Pham*, 281 Kan. 1227, 1241, 136 P.3d 919 (2006) ("'When an in-custody statement is taken in English from an accused whose primary language is not English, but who also speaks English, failure of the officers to have an interpreter in attendance pursuant to K.S.A. 75-4351[e] does not vitiate the statement if it was freely, voluntarily, knowingly, and understandingly made with full knowledge of the *Miranda* rights.'").

Here, no *Miranda* rights were given to Wabuyabo in English or in any other language. This factor weighs in favor of involuntariness.

7.      *Totality of the circumstances*

Under the totality of the circumstances, the factors favoring involuntariness grossly outweigh the factors favoring voluntariness. McMillian was extremely unfair in conducting the interview. He exploited very strong and legitimate concerns Wabuyabo, like any reasonable parent, would have had about his children. He did so in a harsh and accusatory demeanor further underscored by the occasional use of a loud voice and/or profanity. McMillian clearly controlled the direction and tone of the interview, and the manner of the interview was consistently tense and accusatory during most of its two-hour duration.

Wabuyabo's age, apparent intellect, and background weigh in favor voluntariness. But their voluntary effect is substantially undercut by the totality of the circumstances because Wabuyabo's ability to comprehend and communicate with McMillian made him more susceptible to McMillian's coercive interview techniques. That is, Wabuyabo's ability to comprehend and appreciate the threats in relation to the custody of his children made him more likely to confess. The weight of Wabuyabo's ability to otherwise communicate with the outside world is likewise significantly diminished under the totality of the circumstances. While Wabuyabo could have ended the interview and called

25

his wife, a reasonable person in Wabuyabo's circumstances would be less inclined to do so where suggestions had been repeatedly made that failing to answer the officer's questions could be detrimental to one's children. Considered in their overall context, the applicable factors demonstrate Wabuyabo's statements were involuntary under the totality of the circumstances.

B. *Harmless error*

As discussed in Issue I, Wabuyabo was subject to a custodial interrogation without *Miranda* warnings. And as we have just explained, his statements were involuntarily made irrespective of *Miranda*. For these reasons, his statements should not have been admitted at trial. This error affected Wabuyabo's constitutional rights. See *Bridges*, 297 Kan. at 1005. As the party benefiting from these errors, the State bears the burden of proving they were harmless. See *State v. Logsdon*, 304 Kan. 3, 40, 371 P.3d 836 (2016). The State can only do so if it persuades us "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). Here, the State has met its burden.

Unobjected-to testimony from Wabuyabo's wife, Dr. Hansen, and Thompson strongly establishes B.W.'s injuries had to have been inflicted while Wabuyabo was exclusively supervising B.W. and the other children. Wabuyabo's statements to Thompson that the other children were not allowed to be with B.W. unsupervised strongly undermine any theory of defense that B.W.'s injuries were caused by the other children.

26

Dr. Hansen's testimony established:

- B.W.'s injuries could not have been self-inflicted;
- B.W.'s injuries would require a significant amount of force to his head;
- A two-month-old infant is not capable of generating this type of force on his or her own, and B.W.'s injuries could not have been caused by a short fall such as rolling off the couch or bed;
- The symptoms prompting Wabuyabo to seek medical attention for B.W. were consistent with the head injuries B.W. suffered; and
- B.W.'s symptoms would have come about suddenly thereafter—"within seconds to minutes of [the] injury occurring."

Accordingly, there is no reasonable probability B.W.'s injuries could have been inflicted at a sufficiently earlier time to cast reasonable doubt based on a theory Wabuyabo's wife or the other children could have inflicted the injuries. Wabuyabo told Thompson he began noticing B.W.'s symptoms—excessive crying, refusal to eat, and flailing around on the bed—between 4:30 and 5 p.m. These symptoms are consistent with what Dr. Hansen would have expected in light of B.W.'s injuries. And, although Dr. Hansen believed these symptoms could become worse over time, B.W. "wouldn't be normal for an extended period of time and then suddenly start having symptoms."

Wabuyabo's wife testified:

- B.W. did not cry when Wabuyabo used electric clippers to cut his hair earlier that morning, Wabuyabo was gentle in doing so, and B.W. did not cry after the haircut;
- B.W. ate well earlier that morning and was not behaving abnormally;
- B.W. also ate well when she fed him around 12:30 p.m.;

- B.W. was asleep in the master bedroom when she left for work around 2 p.m.;
- After she left for work, Wabuyabo was home alone with the children; and
- B.W. showed no abnormal behavior before she left for work and Wabuyabo called her at work when B.W. became unresponsive.

Thompson, upon his arrival at the house, determined from Wabuyabo and his children:

- Wabuyabo was the only adult in the house;
- Wabuyabo did not allow the children to be with B.W. unsupervised;
- N.W. and E.W. generally corroborated Wabuyabo's statement that B.W. began crying in the afternoon; and
- Wabuyabo carried B.W. around trying to comfort him.

Based on B.W.'s injuries, the nature and timing of his symptoms, and the overall circumstances and sequence of events described by Wabuyabo, his wife, and two of his children, all reasonable inferences suggest Wabuyabo caused B.W.'s injuries. Based on Dr. Hansen's testimony, the injuries would have required a significant amount of force such that they could not have been from an accident, self-inflicted, or otherwise inadvertently caused when Wabuyabo cut B.W.'s hair.

The extent and nature of the force required to cause B.W.'s injuries were such that Wabuyabo would have been aware of the nature of his actions and knew or should have known of the substantial and unjustifiable risk he would injure B.W. In other words, Wabuyabo acted recklessly. See K.S.A. 2019 Supp. 21-5202(j) ("A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard

constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.").

Here, the jury convicted Wabuyabo of the lesser included offense of reckless aggravated battery. See K.S.A. 2019 Supp. 21-5413(b)(2)(A) (defining reckless aggravated battery). The evidence undisputedly reflects B.W. suffered great bodily harm based on his injuries. And the evidence so strongly supports a finding Wabuyabo caused B.W.'s injuries and acted recklessly in so doing, we are persuaded beyond a reasonable doubt the jury would not have reached a different verdict had Wabuyabo's statements been suppressed.

Additionally, Wabuyabo's statements to McMillian are far from an explicit confession. The video of the interview itself was not admitted at trial, but many of Wabuyabo's statements came in through McMillian's testimony. However, Wabuyabo's statements were largely used to show he offered inconsistent accounts to McMillian, none of which could innocently explain the cause of B.W.'s injuries. But these potential explanations were already strongly undercut by testimony from Wabuyabo's wife, Dr. Hansen, and Wabuyabo's prior statements to Thompson. Here, "in light of the entire record, . . . there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569. Accordingly, we find the State has met its burden to show the admission of Wabuyabo's statements was harmless.

III.     *The district court properly instructed the jury.*

Finally, Wabuyabo claims the district court erred when it instructed the jury: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty." Wabuyabo asserts the language "you should find the defendant guilty" erroneously deprived the jury of its inherent power of

jury nullification. Wabuyabo's argument was expressly rejected by another panel of this court in *State v. White*, 53 Kan. App. 2d 44, 53-54, 384 P.3d 13 (2016).

*White* addressed the exact jury instruction Wabuyabo challenges here. As *White* explained, this jury instruction is based on PIK Crim. 4th 51.010 (2017 Supp.). *White* began its analysis of this issue, stating:

> "As we consider this argument, we are reminded of the many times our Supreme Court and this court have stated that district courts are 'strongly recommend[ed] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to [jury] instructions.' *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015)." 53 Kan. App. 2d at 53.

*White* then noted several prior decisions from other Court of Appeals panels also rejecting this argument. See 53 Kan. App. 2d at 53-54. Relying on *State v. Singleton*, No. 112,997, 2016 WL 368083, at *6 (Kan. App. 2016) (unpublished opinion), *White* held: "[T]he word should is less of an imperative than must or will. The word should is advisory, not compulsory." 53 Kan. App. 2d at 54.

Wabuyabo argues the word "should" is synonymous with "must," and the terms are interchangeable based on their common meanings. Although Wabuyabo does not address the decision in *White*, he acknowledges *State v. Allen*, 52 Kan. App. 2d 729, 735, 372 P.3d 432 (2016)—one of the cases cited in *White*—is contrary to his argument. See *White*, 53 Kan. App. 2d at 53 (citing *Allen*, 52 Kan. App. 2d 729, Syl. ¶ 5). But Wabuyabo offers no argument why *Allen*—or, by extension, *White*—should not be followed here. He essentially sidesteps the effect of *Allen* by immediately returning to his argument that "must" is synonymous with "should."

While one panel of our court is free to disagree with another, Wabuyabo offers no reason why we should disagree with *Allen* or *White*. See *State v. Fleming*, 308 Kan. 689,

706, 423 P.3d 506 (2018) (one Court of Appeals panel may disagree with decision of prior panel). This is particularly troubling because *White* cited five prior decisions of other panels reaching the same result. In other words, *White* effectively demonstrated there was no disagreement among the various panels of our court that had already examined this issue. See 53 Kan. App. 3d at 53-54 (citing *Allen*, 52 Kan. App. 2d 729, Syl. ¶ 5; *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *1-2 [Kan. App. 2016] [unpublished opinion]; *State v. Hastings*, No. 112,222, 2016 WL 852857, at *4-5 [Kan. App. 2016] [unpublished opinion], *abrogated on other grounds by State v. Yazell*, 311 Kan. 625, 629, 465 P.3d 1147 [2020]; *Singleton*, 2016 WL 368083, at *4-6; *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 [Kan. App. 2015] [unpublished opinion]).

Subsequent Court of Appeals panels have continued to follow *White* and *Allen*. See *State v. Moore*, No. 119,521, 2020 WL 2602056, at *10 (Kan. App. 2020) (unpublished opinion), *rev. denied* September 29, 2020; *State v. Ibarra*, No. 117,562, 2018 WL 2375779, at *5-6 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1351 (2019); *State v. Spalding*, No. 114,561, 2017 WL 1433513, at *8 (Kan. App. 2017) (unpublished opinion); *State v. Bostic*, No. 115,114, 2017 WL 1382603, at *4-6 (Kan. App. 2017) (unpublished opinion); *State v. Fuchs*, No. 115,695, 2017 WL 462853, at *3 (Kan. App. 2017) (unpublished opinion). Collectively, the decisions on which *White* was premised—including *Allen*—and subsequent decisions applying *White* and *Allen* reflect a unanimous view among all prior panels of this court. Wabuyabo offers no persuasive reason why we should now break from the 11 prior panels that have consistently rejected the same argument over the past 5 years.

Further, Wabuyabo's argument that "must" and "should" are interchangeable based on their plain meaning is based on a single dictionary definition. But Wabuyabo's cited definition is inconsistent with our Supreme Court's longstanding interpretation of "should" as a discretionary term. See, generally, *Fischer v. State*, 296 Kan. 808, 818-22,

295 P.3d 560 (2013) (use of the word "should" gave district court discretion to decide whether defendant appeared in person or by telephone for K.S.A. 60-1507 evidentiary hearing). It is also expressly contrary to our Supreme Court's holding in *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014). *Smith-Parker*, 301 Kan. at 164, explicitly overruled *State v. Lovelace*, 227 Kan. 348, 354, 607 P.2d 49 (1980), which had allowed "must" and "should" to be used interchangeably in jury instructions. We are duty bound to follow Kansas Supreme Court precedent absent some indication our Supreme Court is departing from its prior position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). There is no indication our Supreme Court is departing from its position in *Smith-Parker*. Accordingly, Wabuyabo's argument that "must" and "should" are interchangeable fails.

Wabuyabo acknowledges he did not object to the jury instruction at the time it was given. Accordingly, we review his claim under the clear error standard. See *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). Because the instruction was not legally erroneous, we need not consider whether it was clearly erroneous. See *White*, 53 Kan. App. 2d at 54.

In conclusion, we find the district court's error in admitting Wabuyabo's statements made during his custodial interview at the police station was harmless and the district court properly instructed the jury.

Affirmed.

***

BUSER, J., concurring:  I concur in the affirmance of Wabuyabo's conviction for reckless aggravated battery. I write separately to first express disagreement with my colleagues' finding that Detective James McMillian's interview was custodial and, as a

32

result, the detective was required to advise Wabuyabo of his *Miranda* rights and obtain a knowing and voluntary waiver prior to the interview. Second, I want to explain why I believe Detective McMillian's interview resulted in an involuntary confession.

*Wabuyabo's Interview Was Not Custodial*

At the outset, I agree with the majority that the eight-factor test stated in *State v. Lewis*, 299 Kan. 828, 835, 326 P.3d 387 (2014), controls the analysis of whether the interview is custodial. In my opinion, however, the majority places undue emphasis on the fact that the interview was conducted at the police station in an interview room, which was accessed by walking through secured doors. Regarding the first factor (the time and place of the interrogation) my colleagues state:

> "A reasonable person, after having gone through the locked doors requiring the use of McMillian's security keycard, likely would not have felt free to terminate the interview and to leave the interview room as he or she would have if the interview room was just past the public lobby and required no special means to enter or leave." Slip op. at 7.

Then again, with regard to the fifth factor (the presence or absence of actual physical restraint or its functional equivalent), although Wabuyabo was unrestrained during the interview, my colleagues assert that "[a] reasonable person in [Wabuyabo's] circumstances would not have felt free to walk out of the interview room and figure out how to get out of the building through the locked doors. This appears to constitute some increased level of constructive restraint." Slip op. at 15.

I acknowledge that "[g]enerally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere." *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012). Still, I am unaware of caselaw precedent relating to these two *Lewis*

33

factors that places such undue emphasis on the number of secured doors necessary to access an interview room.

On the other hand, Kansas caselaw is replete with cases—similar to this case—wherein an individual arrived at a police station voluntarily, was informed that he or she was not under arrest, that the individual could leave at any time, was not restrained, and freely left the police station after the interview. In all these similar cases, the interview was found to be noncustodial. See *State v. Morton*, 286 Kan. 632, 647, 186 P.3d 785 (2008) (listing cases).

In short, having considered the eight factors listed in *Lewis*, I would have found only two factors (the conduct of the officer and the person subject to the interrogation and whether the person is being questioned as a suspect or a witness) weighed in favor of a custodial interview. Under the totality of the circumstances—and without the undue emphasis placed on the number of secured doors leading to the interview room—I would conclude that the interview was not custodial.

*Voluntariness of the Interview*

Regarding the second issue relating to the voluntariness of the interview, I agree with my colleagues that the interview was involuntary. I write separately, however, to make clear that, in my opinion, the critical factor in arriving at this legal conclusion was the manner of the interrogation; in particular, Detective McMillian's repeated entreaties to Wabuyabo to admit wrongdoing for the sake of his children.

Kansas appellate courts have made it clear that attempting to use a suspect's children to coerce an incriminating statement is not permissible. See *State v. Brown*, 286 Kan. 170, 181, 182 P.3d 1205 (2008) ("[I]f a parent is compelled to admit to criminal acts or face the loss of his or her parental rights, the incriminating statements will be excluded

from evidence when the parent becomes a defendant in criminal proceedings."); *State v. Boyle*, No. 104,521, 2011 WL 420738, at *3 (Kan. App. 2011) (unpublished opinion) ("[T]he teaching of [*State v.*] *Brown*[, 37 Kan. App. 2d 726, 157 P.3d 655 (2007)] is that the better practice dictates that statements of interrogators on the consequences to children due to failure to confess may imperil the voluntariness of any statements thereafter made by a suspect.").

As detailed in our opinion, Detective McMillian repeatedly used Wabuyabo's children to cajole the defendant into admitting that he injured B.W. The effectiveness of this impermissible technique is apparent in Wabuyabo's statements: "For the sake of my kids, I'll have to accept. For the sake of my kids, I'll have to. There's no other solution. I'll have to." Slip op. at 21. While not admitting to wrongdoing, Wabuyabo's statements taking responsibility for B.W.'s injuries for the sake of his children were the result of Detective McMillian's improper interviewing technique which resulted in the involuntary statements.